JENNIE PFEIFER, Respondent, v. SUPREME TRIBE OF BEN HUR, Appellant.

St. Louis Court of Appeals.    Submitted on Briefs April 5, 1915.
Opinion Filed May 4, 1915.

1. LIFE INSURANCE: Sufficiency of Proof of Death: Circumstantial Evidence.  In an action on a life insurance policy, where there was evidence tending to show that, at a certain time and place, insured was shot and killed, although his body was never seen or identified by any one who was acquainted with him, it was not necessary to a recovery that plaintiff prove

that efforts were made to locate insured, as would be required if the unexplained disappearance of insured for the statutory period were relied on as proof of death.

2. ————: ————: ————. In an action on a life insurance policy, evidence *held* sufficient to warrant the jury in finding that insured was killed at a certain place and time, although his body was never seen or recognized by any one thereafter.

3. ————: ————: **Evidence.** In an action on a life insurance policy, where the evidence as to the death of insured is circumstantial, evidence of the character and habits of insured and of his affection for his family is admissible as tending to show lack of motive for desertion.

4. **TRIAL PRACTICE: Demurrer to Evidence: Rules of Decision.** In determining whether defendant's demurrer to the evidence should be given, plaintiff is entitled to the benefit of all the inferences which the jury can legitimately and properly draw from the evidence.

5. **LIFE INSURANCE: Sufficiency of Proof of Death: Circumstantial Evidence.** In an action on a life insurance policy, where the evidence of the death of insured is circumstantial, the fact that the body was never seen or identified by any one who was acquainted with insured does not preclude the jury from drawing an inference of death from such evidence.

6. ————: ————: ————: **Instructions.** The evidence, in an action on a life insurance policy, was sufficient to warrant a finding that insured died as a result of a gunshot wound inflicted on the date specified in the petition. His body was never seen or identified by anyone who was acquainted with him. At the instance of plaintiff, the court charged the jury that, in order to entitle plaintiff to recover, she must prove to the satisfaction of the jury, by a preponderance, or greater weight, of the evidence, that insured died on or about the date specified in the petition, "but the fact or time of his death may be established by circumstances, in the absence of direct and positive evidence," and that there was no evidence of any person who saw and identified the body of insured after such date, and, therefore, in determining whether he died on or about such date the jury should take into consideration the particular circumstances of his disappearance, his character, habits, relations and conduct with and toward his family at home, and, from all such facts and circumstances in evidence, if they believed that his absence from his home and family for any cause other than his death was improbable, their verdict and finding on the issue of his death should be in favor of plaintiff. *Held*, that the instructions correctly declared the law.

7. **APPELLATE PRACTICE: Conclusiveness of Verdict.** A verdict supported by substantial evidence is conclusive on the appellate court.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock*, Judge.

AFFIRMED.

*Karl M. Vetsburg* for appellant.

(1) The demurrer to the evidence offered by appellant should have been sustained. Bradley v. Modern Woodmen, 146 Mo. App. 428; Walsh v. Insurance Company, 162 Mo. App. 553; Biegler v. Supreme Council, 57 Mo. App. 419; Modern Woodmen v. Gerdom, 2 L. R. A. (N. S.) 809; Hitz v. Ahlgren, 170 Ill. 60; Modern Woodmen v. Graber, 128 Ill. App. 585; Bailey v. Bailey, 36 Mich. 184; McNulty v. Mitchell, 84 N. Y. Supp. 89. (2) A presumption of death cannot arise unless diligent search and inquiry for the missing person has been made. Same cases as point 1.

*Jno. B. Dempsey* for respondent.

Death, like any other fact, may be established by circumstantial evidence, when direct evidence is not attainable; and when absence without tidings concurs with other attendant and supporting circumstances to produce the conviction that the party is dead, such proof is all that can be required. 3 Bacon, Benefit Societies and Life Insurance, sec. 470. The presumption of death may arise from circumstances of disappearance and being brought in contact with specific perils. Lancaster v. Washington Life Ins. Co. of New York, 62 Mo. 121. Facts and circumstances relating to the character, habits, conditions, affections, attachments, prosperity and objects in life which usually control the conduct of men, and are the motives of their actions,

are competent evidence from which may be inferred the death of one absent and unheard from, whatever has been the duration of such absence. A rule excluding such evidence would ignore the motives which prompt human actions, and forbid inquiry into them in order to explain the conduct of men. Tisdale v. Connecticut Mutual L. Ins. Co., 26 Iowa, 170; Fidelity Mutual Life Ins. Co. v. Mettler, 185 U. S. 308; Northwestern Mutual L. Ins. Co. v. Stevens, 71 Fed. 258. The presumption of continued life of the insured after December 24, 1911, is overcome not only by his character and habits, but also by the facts and circumstances attending his actions upon the day in question as well as by the fact of a specific peril shown by the evidence. In fact the testimony of Harry Pfeifer is so strong as to need only the production of the dead body of his father to establish death beyond cavil. The circumstances of Louis Pfeifer's disappearance not only tend to prove his death, but they tend to prove that he was killed, and the jury might legitimately infer that his death was a murder—that he was shot and killed. Supreme Council v. Boyd (Ind. App. Ct.), 37 N. E. 1105. The sufficiency of presumptive proof of death at common law depends upon the facts of each case and the rule requiring diligent search and inquiry as one of the conditions necessary to establish death from an absence of seven years does not apply where the man was last seen in a position of peril. And furthermore if the defendant wished the jury to pass upon the question of whether diligent search had been made it was for it to request said instruction. This it did not do and it ought not now to be heard to complain. Biegler v. Supreme Council of Am. Legion of Honor, 57 Mo. App. 419.

REYNOLDS, P. J.—This action was begun on August 21, 1912, on a benefit certificate issued by defendant, a fraternal beneficiary association organized under the laws of the State of Indiana and authorized

to do buisness in this State under our laws relating to such associations. The certificate was issued to one Louis Pfeifer as a member of the order, and under it, if he died while a member in good standing, the order contracted to pay to his widow, plaintiff here, the sum of $900. Alleging that Louis Pfeifer died on December 24, 1911; that at the time of his death he was a member in good standing of the defendant order; that plaintiff is the widow and the person mentioned in the certificate as the beneficiary; that she had complied with all the requirements of the certificate of membership and had demanded payment of the sum mentioned in it, and that it had not been paid, plaintiff demanded judgment for the amount.

The answer was a general denial.

It was admitted at the trial of the case that defendant was incorporated as alleged and that while defendant denied that the member was dead, it admitted that plaintiff had filed with it proofs of loss as required by the benefit certificate.

On the trial of the cause before the court and a jury, the testimony of plaintiff herself was to this effect: She and Louis Pfeifer were married in 1879. They had six children, all living, the youngest, Harry, about twenty-one years of age in June, 1913. Her husband's health was generally good. He was a carpenter by trade and worked steadily at that trade during the summers. They had never had any domestic trouble of any kind. He was of good disposition and cheerful; loved his family; spent his leisure time evenings and Sundays at home; attended lodge meetings, his wife sometimes accompanying him. During the last six or seven years he had spent his winters down south, in part for pleasure and in part for what he could earn by hunting and fishing. His family were raised and he thought he was entitled to spend his winters in this way. His wife occasionally accompanied him. There was never any disagreement between them about

his making these trips in the winter. He made these trips in what was called a "Joe" or a "John" boat, which he built himself, and which appears to have been a boat square at both ends and in which he would drift down the river. His youngest son, Harry, had accompanied him on many of these trips for the last five or six years. While he was on these trips she heard from him sometimes every five weeks, sometimes oftener; more frequently the son wrote, keeping her informed of her husband's whereabouts, except when they were changing from one place to another. When her husband went away on these trips he made provision for the support of his wife during his absence. His trips were not for money making but for pleasure, she repeated, and her husband had never absented himself for any length of time without letting her know where he was. She had not heard from him since December 24, 1911.

On cross-examination plaintiff testified that her husband had always made provision for her; that she was not compelled to work to support herself and family unless she felt like it, although she worked occasionally to get a little extra spending money. They were very poor people and sometimes she wanted things she could not get with the money her husband had given her and she worked for those; also worked to pay the premiums on the insurance. At the time her husband left for this trip south, there were no disagreements or misunderstandings between them. She had not seen her husband nor his body since December 24, 1911.

The son of the parties, Harry Pfeifer, testified that his father was a carpenter; that he, the son, would be twenty-one years old in June, 1913. He had lived at home with his parents, who always got along well together and had no trouble that he knew of. His father had always treated his children nicely, stayed at home, working steadily and providing for his wife and for this son, who appear to have been the only

members of the family living at home, although they had six children. Harry (this witness) had gone to school until he was fourteen years of age. After that he had worked. His father worked all summer at his trade as a carpenter, providing for his wife. When he went on these trips south he left money to keep her through the winter. On the trips south when Harry, the son, accompanied him, the father made just enough to provide for living by fishing and hunting. The last time his father left home was in September, 1911. The son, Harry, left with his father on this trip. There was not a word of any quarrel or dispute between his father and mother. They seemed to hate to part. While on these trips Harry and his father would write home and wait for answers which would generally take three, four or five weeks. They wrote as soon as they received an answer to their letters from his mother. When moving from one place to another they would write to his mother and tell her not to answer because they were going to move but to wait until they wrote again. His father was a peaceable man. They always kept to themselves; did not bother anybody or have quarrels with anybody; his father always tried to make fun and make the trip as happy as he could, earning just enough to keep them through the winter. They usually came back on the train on money that his father had made trapping and hunting. When he got home his father, after he had been home a day or two, settled down to work. He was not a drinking man. Witness had never seen him take but one or two drinks; never saw him drunk. The last time Harry saw his father alive was on the evening of Sunday, December 24, 1911. He and Harry were then on the Arkansas side of the Mississippi River, opposite Catfish Point, in Mississippi. Arkansas City was the nearest town and that was twelve or fourteen miles down the river. There was a man in the neighborhood where they stopped named Henning. His father had worked for him two

or three days and he owed his father money.  Across the river at Catfish Point there is a shanty boat and a house below "about two or three blocks." The shanty boat was occupied by a man and a woman but he did not know who lived in the house.

The places around there were not settled, it being a wild country.  This last time Harry saw his father was on this Sunday when his father was going across the river to collect money that a man named Ross owed Henning.  Henning and Ross had had trouble, so that Henning would not go across the river for his money.  Henning owed his father some money and Pfeifer and his son had had no trouble with Ross or anyone else down there.  Henning told his father that he thought he, Pfeifer, could get the money from Ross and could pay himself out of the money Henning owed him.  So his father took Henning's skiff and went across the river.  When he reached the other side the witness (Harry), as he testified, saw two "fellows" run out and fire two shots and he heard his father groan. Harry could see his father until the latter got almost to the other side of the river.  Harry had a pair of field glasses and looked through them.  He could not see what became of his father when he reached the other side.  The shore on the other side was a bluff bank.  The last he saw of his father, he was about ten or fifteen yards below where the shanty boat was located.  It was foggy below that bluff bank and there was a kind of fog over the water.  His father was crossing over under this bluff bank and the fog prevented him from seeing him any further.  The shanty boat was from twenty to twenty-five feet above the level of the river on this bluff.  It was after Harry lost sight of his father that he saw these "fellows" on the bank start running but did not know who they were.  They started scrambling around on the bank, then went into the shanty boat—went in and out.  It was hard to say from where he stood whether they had anything in their

hands, but when his father was trying to touch the bank Harry heard two shots and saw the smoke right at the spot below the shanty boat around where these men were; heard his father "holler and groan," but could not make out what he said and did not hear anything more; never saw his father afterwards. He remained opposite Catfish Point until the following Tuesday. He could not go over the river to find out what had happened, because he could not handle their boat on account of the rough water and the wind. Henning's skiff was never returned to his side of the river. Witness never saw it again. When his father left to go across the river in Henning's skiff he had his gun with him, a ten bore double-barreled shotgun. Witness testified that he got this gun from a man who had charge of a flatboat in Arkansas City but did not know the name of the man. This gun was his father's gun, the same gun he had when he left witness opposite Catfish Point, and the point where the man had the gun which he gave to witness was on the Mississippi shore, opposite Arkansas City. He had never found any trace of his father afterwards; never saw the skiff in which he went across the river again, and had never heard of his father since then. It was about three o'clock in the afternoon when his father left to go to Catfish Point.

On cross-examination he repeated this testimony with no particular change except going more particularly into the description of the locality, and saying that the river there was something over a mile wide. He testified that he had not crossed the river after his father crossed. He was then nineteen or twenty years of age, had chills and malaria at the time and could not handle their boat to get across. He could not get his boat away on account of the waves and the high wind; could not get to Arkansas City by land because a creek ",cuts behind there; we were surrounded by water," and could not then float down stream to Ar-

kansas City on account of the condition of the wind and waves. He stayed where his father had left him for two days. He identified the gun which had been given to him at Arkansas City by its appearance. While he could not remember the number of the gun he knew by looking at it that it was his father's gun; there was not a gun in the south like it that he had ever seen. There was a bullet mark on the gun when he got it that was not on it when his father took it with him that day; did not know the name of the party from whom he got the gun after this 24th of December; it was from a man on "this willow flat" whose name he did not know; did not know how the gun had got down opposite Arkansas City; did not know who took it down there or how it got there, as he had not seen it taken down. He had never seen his father's body since that 24th of December, 1911, dead or alive.

One Wilson, whose deposition was read in evidence, testified that in December, 1911, he was staying across the river opposite Arkansas City, at a landing known as Hard Baggen. On or about the 25th or 26th of December, 1911, two men came to where witness was camped. He did not know their names. They were in a skiff and were towing another skiff. In this skiff which they were towing was the body of a dead man whom witness did not know and could not tell how long he had been dead. They also found in the skiff a number ten bore double-barreled shotgun, both barrels loaded. Witness testified that he judged from the condition of the man's face that he had been shot. There were holes in the boat where the bullets went through the side of it. The holes looked like they had been made by good sized shot. To the best of his recollection the dead body remained there in this skiff two days and two nights. There was a high wind which kept the boats rocking and the holes in this boat caused it to leak and the next morning this boat in which the body had been turned over and the body was gone.

On cross-examination this witness deposed that he had never before met the men who brought this body there and had never met them since; did not know the name of the man whose body was in this skiff; did not, of his own knowledge, know how the man came to his death; examined the body closely enough to say that he could swear that death was caused from a gunshot wound. The holes in the boat were caused by gunshot. He found nothing on the body or in the boat containing it that would lead to the identification of the corpse; did not know what had become of the body.

Other witnesses testified as to the character of Mr. Pfeifer; that he was jovial and pleasant with his family; very industrious, always spent his evenings and Sundays at home; his disposition toward his children was very friendly and he was not addicted to drink. This evidence was by witnesses who testified that they had visited the Pfeifer home frequently, their birthdays coming close together, and they often celebrated them together.

At the conclusion of the testimony for plaintiff, the certificate being admitted calling for the payment of $900 to plaintiff on receipt of proofs of the fact and cause of death of Louis Pfeifer, its genuineness being admitted, plaintiff rested.

Whereupon defendant asked the court to instruct the jury that under the pleadings and evidence offered by plaintiff, their verdict must be for defendant. The court refused to give this and defendant offering no testimony, the cause was submitted to the jury on instructions asked by plaintiff to the following effect:

First, that in order to entitle plaintiff to recover in this case, she must prove to the satisfaction of the jury and by a preponderance or greater weight of the evidence that Louis Pfeifer, her husband, died on or about the 24th of December, 1911, "but the fact or time of his death may be established by circumstances

in the absence of direct and positive evidence.'' The jury were further told in this instruction that in the case before them there was no evidence of any person who saw and identified the body of Louis Pfeifer after December 24, 1911, and therefore in determining whether he died on or about December 24, 1911, the jury should take into consideration the particular circumstances of his disappearance, his character, habits, relations and conduct with and toward his family at home and from all such facts and circumstances in evidence, if they believed that his absence from his home and family for any cause other than his death was improbable, their verdict and finding on the issue of the death of Louis Pfeifer should be in favor of plaintiff.

Another instruction was given as to the amount of recovery, if the finding was for plaintiff.

The jury returned a verdict in favor of plaintiff for the amount claimed and interest.

Filing a motion for new trial and excepting to that being overruled, having also saved exceptions to the action of the court in overruling the demurrer to the evidence and in giving the instructions, defendant has duly perfected its appeal to our court.

This is not a case of an effort to recover for death, the fact of death resting on the presumption of unaccounted absence from this State for seven years or more. Hence cases like Biegler v. Supreme Council of American Legion of Honor, 57 Mo. App. 419; Bradley v. Modern Woodmen of America, 146 Mo. App. 428, 124 S. W. 69; Walsh v. Metropolitan Life Ins. Co., 162 Mo. App. 546, 142 S. W. 815, and Modern Woodmen of America v. Gerdom, 72 Kan. 391 (as also notes to the latter in 2 L. R. A. (N. S.) 809), relied upon by the learned counsel for appellant, which hold it necessary to recovery in case of unexplained disappearance for the statutory period to show efforts made to find

191M.A.4

and locate the party who was claimed to be dead, are not applicable. Here there is no unaccountable disappearance for seven years relied upon. The case proceeds on the theory that the insured was killed on a day named. So the jury were to pass on the testimony adduced to support that theory and such inferences as could legally follow. They were not to found their verdict on a presumption of death which arises from continued and unexplained absence for seven years or more but on evidence of death at the time named and at a given place.

There is this to be said, however, as to the absence of evidence as to a thorough search. First, these people, the plaintiff and her family, were poor people and without means to make anything like a thorough investigation. In the next place, the facts as known to them, accepting their evidence, were such as to render a search as for a missing man unnecessary. His family relations were of the very best; he was a kind and loving husband and father; industrious, sober, cheerful, fond of his home. His son saw him leave in a skiff to cross the river, on a rather thankless errand, that is to collect money from one man, due to another, these two not on good terms. He went in a skiff of the creditor to the vicinity of the debtor—this on a foggy day when he could possibly have been mistaken for the creditor by the debtor. The son saw the father attempt to land, heard the shots, heard his father cry aloud and saw no more of him. All that his father had with him was his gun. Two or three days afterwards the son recovered this gun—from whom does not appear. He waited around there for two or three days, prevented by the condition of the river from moving sooner, with no boat at hand but an unmanageable scow or flat boat, fit only to drift, and then floated down to where he undoubtedly received this gun of his father, and while he did not testify to any conversation between him and the man who had seen the dead body in

the skiff, he had every reason to suppose it was that of his father and that further search was unnecessary.

We have set out substantially all the evidence as to the fact of death, as also the substance of the evidence which plaintiff saw fit to introduce as tending to rebut any presumption of an intentional desertion or absconding of the member from his home and family. This latter class of evidence has probative force, as showing any lack of motive and in that view is relevant here. But the case really turns upon the weight which the jury gave to the evidence of death at the time and place. The question is, was it sufficient to warrant the jury to find actual death, at a given time? On consideration of defendant's demurrer to the evidence, on which demurrer defendant rested, the plaintiff is entitled to claim the benefit of all the inference which the jury can legitimately and properly draw from the evidence. The fact that this evidence of death then and there is circumstantial and that the dead body —the *corpus delecti,* if we may use that phrase in this connection—is not accounted for, does not destroy the inference of death which may be drawn from the evidence, and we cannot say that on this evidence, as produced, the jury were not warranted in drawing the inference of death as occurring under the circumstances stated and at the time and place as testified. The instructions given by the court at the instance of plaintiff are correct as to the law and fitted the facts in the case. We see no reason for complaint with respect to them on the part of defendant, appellant here. There was substantial evidence of the fact of death warranting the submission of the case to the jury; its finding on this concludes us.

Finding no reversible error, the judgment of the circuit court is affirmed. *Nortoni* and *Allen, JJ.,* concur.