E. W. ANDREWS *v.* HARRIS R. WATKINS' ESTATE.

February Term, 1932.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 4, 1932.

322

*Guy M. Page* and *Hollis C. Porter* for the defendant.

*J. A. McNamara* for the plaintiff.

POWERS, C. J.   The plaintiff seeks to recover from the estate of the late Harris R. Watkins a claim for the care and keep of a Shetland pony called "Pinto."   He presented this claim to the commissioners of the estate, and it was disallowed.   He appealed

to the county court, where a jury trial resulted in a verdict and judgment in his favor. Exceptions by the defendant bring the case here for review.

The plaintiff's evidence tended to show the following facts: Pinto was a pony that Dr. Watkins' son, Eustace, who died in 1924, had and used when he was a small boy. The Watkins family, which consisted of Dr. Watkins, his wife, and Eustace, was much attached to the pony. She was wintered by the plaintiff in 1917-1918 under an arrangement not here involved, and sometime about the first of May, 1918, she passed into the possession of a Mr. Hartin, who kept her three or four weeks. About the first of June of that year, Dr. Watkins went to the Allen farm on Shelburne Road where the plaintiff then lived, and engaged the latter to keep and care for Pinto at a price named by the doctor of twenty dollars per month. The pony at once came back to the plaintiff's possession, and was kept and cared for by the plaintiff under the arrangement made as aforesaid from that time until the death of Dr. Watkins. Two payments were made by him on account of this arrangement, both by check. During the time the plaintiff was keeping Pinto, he resided in various towns, usually in the hotel business, and always having the pony with him. Dr. and Mrs. Watkins called at these places to see the pony, and both manifested affection for her.

To meet the plaintiff's claim and to make it appear improbable that any such contract was ever made, the defendant gave evidence tending to show that the price agreed to (according to the plaintiff's evidence), was excessively high; that it was four or five times what a reasonable price would be; that it was that much higher than what Dr. Watkins had paid the Prestons for satisfactorily wintering this pony. And it was claimed that this, of itself, stamped the claim sued on as fraudulent and unfounded. This theory of the defense developed early in the trial below, and was much relied upon throughout that trial. To meet this phase of the defense, the plaintiff pointed to the evidence of the affection of the Watkins family for Pinto, to the doctor's expressed desire to have her well taken care of, and to make it more probable that he did make the contract relied upon, and especially to make the price sound more plausible, he offered the inventory of Dr. Watkins' estate filed in the pro-

bate court on October 31, 1930, about eight months after his death. The defendant objected; but the inventory was admitted and the defendant excepted. It showed a gross estate of over five hundred and sixty thousand dollars.

■■ It is a rule of general application that on the question whether a person did a particular thing or made a particular contract or not, the character of the subject-matter, the relation of the parties to it and to each other, and the circumstances affecting the probability of the thing having been done or the contract having been made as claimed, are relevant and admissible evidence. *Gilfillan* v. *Gilfillan's Estate*, 90 Vt. 94, 101, 96 Atl. 704, and cases cited. But, ordinarily, the fact that a man is rich or poor is not such a circumstance and is not admissible as evidence that he did or did not make a certain contract. *Frost* v. *Frost's Admr.*, 33 Vt. 639, 649. Nevertheless, there are exceptional cases in which the financial situation of a party to the suit is deemed to be sufficiently relevant to be admissible. The case last cited was such a case. There, the plaintiff was trying to recover the sum of three hundred dollars per year for services rendered the decedent under an alleged contract in which that amount was stipulated for, though the evidence indicated that this was some three times what the services were reasonably worth. The defendant offered to show the amount of the decedent's property at the time of the alleged contract to show that such a contract would have been largely disproportionate to his ability to pay. Subject to the defendant's exception, this evidence was excluded, and held error. The Court took the position that it was admissible "as tending, in connection with the other evidence, to show that it was improbable that a man of his (limited) property would employ a housekeeper at so extravagant a price," permanently. The opinion points out that it was the circumstances that the contract was for the life of the decedent and an apparently gross inadequacy of the service to the stipulated compensation that made the evidence admissible. The case presents, of course, the converse of the proposition advocated by the plaintiff here. But it is difficult to differentiate the cases on purely logical grounds.

*Blaisdell* v. *Davis*, 72 Vt. 295, 48 Atl. 14, 18, was a case wherein the administrators of an estate were claiming to recover an alleged loan. It appeared that the defendant married the

only daughter of the intestate and removed to and engaged in business in Wisconsin. The intestate and his wife were very anxious to get the defendant's family back to Vermont so that they could have their daughter near them. The defendant's evidence tended to show that Nelson, the intestate, proposed to the defendant that if he would sell out his business and move back to Barton to live, he (Nelson) would give him $6,000; and that he complied with this condition. He did not deny that he received the $6,000, but he insisted that it was paid to him under the above arrangement and not as a loan as the administrators alleged. The court admitted evidence tending to show that Nelson was worth about $50,000. This was received on the ground that it would be some evidence that he made the unusual contract that the defendant relied upon in defense. This ruling was sustained. The Court pointed out that the argument that no presumption that a man agreed to pay money arises from the fact that he has ample means to pay it did not reach the ground of admissibility. "Many facts," says *Munson, J.,* "that have no independent tendency to establish an issue, become admissible after other evidence has been adduced. This fact was offered as bearing upon the probability of a very unusual agreement as to the making of which direct evidence had been introduced. The essence of the defendant's claim was that Nelson had given $6,000 for the pleasure of having his daughter live near him. We think the possession of ample means would have a legitimate bearing upon the question whether such a contract had been made."

In *Gilfillan* v. *Gilfillan's Estate,* 90 Vt. 94, 96 Atl. 704, 706, the plaintiff sought to recover for board and care of the intestate. She was the widow of his brother. The defense was that the intestate had given the plaintiff money, and that the board and care were furnished in consideration thereof. The defendant made the claim that the intestate let the plaintiff have certain stocks to apply on the board account. To meet this claim that the stocks were so to apply, the plaintiff was allowed to show that at the same time the intestate gave stocks to Walter Gilfillan and to some of his other relations. That at one time, when he was making a distribution of some of his property, the intestate said he wanted to treat the plaintiff as he did his sisters; and a witness who made the distribution was allowed to

state the total amount distributed, and the names of the relatives and the amounts received by each. All this was subject to the defendant's exception. In the Supreme Court, the defendant complained that the evidence disclosed that the intestate was a man of large means, and insisted that it had no legitimate bearing on the question whether the intestate was owing plaintiff at the time of his death. But this Court held against the defendant, and speaking by *Taylor*, J., said: ''His argument loses sight of the fact that he had opened the door for this kind of evidence by attempting to show that the stock received by the plaintiff was in satisfaction of this indebtedness. To meet this issue, plaintiff was not confined to showing the bare fact that the stock was delivered to her as a gift, but was entitled to show the corroborating circumstances. All this evidence affected the probability of the plaintiff's claim * * * *.''

*In re Wells' Will*, 95 Vt. 16, 113 Atl. 822, involved a different, though somewhat similar question. It was a will case involving the question of undue influence. There was evidence tending to show some feeling on the part of the testatrix against one of the contestants—or at least just cause for it—and as further evidence tending to account for the action of the testatrix in making an outsider a large beneficiary of her will, the proponent was allowed to show the amount and testamentary disposition of her husband's property, whence came most of her own, and to introduce other papers showing the amount that one of the contestants had and would receive out of the family estate. It was held that this evidence afforded the basis of reasonable inferences in support of the facts in issue. The case affords no support for the plaintiff's theory in the case before us, though it is not out of line with those above referred to.

■ The rule deducible from these cases may be thus stated: The fact that a defendant is rich does not, of itself and standing alone, afford any evidence that he entered into the contract relied upon in a suit against him. But when the course of the trial or the character of his defense brings the issue to a point requiring a test of probabilities, and there are corroborating circumstances making it reasonable to do so, evidence of his wealth at the time the alleged contract was entered into may be admitted to affect the probability that he made such a contract.

■ That the character of the defense here made opened the door to the plaintiff to avail himself of this rule cannot be denied in the face of the cases above referred to. But it does not follow that the evidence was properly admitted. The corroborating circumstances making it reasonable to give the plaintiff the benefit of the rule are lacking. Dr. Watkins' special interest in the plaintiff or his family is not shown. In *Blaisdell* v. *Davis, supra,* the natural affection of a parent toward an only daughter and his anxiety to have her near him, and the fact that the $6,000 would in some measure at least go for her benefit, were circumstances making it reasonable to apply the rule in the defendant's behalf. In *Gilfillan* v. *Gilfillan's Estate, supra,* the plaintiff was the widow of the intestate's brother; he thought well enough of her to make a permanent arrangement to board with her, one expected to last as long as he lived; he thought well enough of her to have and express the desire to treat her like an own sister; his own family had left him. These were circumstances making it reasonable to apply the rule in behalf of the plaintiff.

In such cases, the fact that the defendant was wealthy could safely be admitted to make it appear somewhat more probable that an improvident contract was actually made. But here there was no relationship, no natural desire to be realized by donating to the plaintiff—nothing tending to explain why Dr. Watkins should desire to make the plaintiff an object of his bounty. It is shown that he had an affection for this playmate of his deceased son. It can readily be seen that he would have. But affection for the pony furnishes no rational implication of generosity to the plaintiff. All that the plaintiff was doing for the pony could have been done by others at very much less cost. There is nothing in the record to warrant an inference that there was any reason, sentimental or otherwise, for such a generous gratuity to the plaintiff as this contract would imply.

■ The dangerous character of the evidence under discussion is obvious. Even in cases proper for its admission, it should be applied with caution and carefully limited by the court's instructions. The rule should not be liberalized—especially not to the extent herein asked for.

■ ■ The defendant makes the further point that the mere fact that Dr. Watkins was rich when he died in 1930 could not

be used as evidence making it more probable that he made an improvident contract in 1918, since that would involve the use of a secondary inference. That one inference cannot be based upon another is well established. *Vermont Shade Roller Co.* v. *Burlington Traction Co.*, 102 Vt. 489, 499, 150 Atl. 138, and cases. Here the fact that Dr. Watkins was rich in 1918, if evidenced at all by the inventory of his estate, must be inferred from the fact that he was rich in 1930. To make the further inference that, because he was rich in 1918, he made an improvident contract, would violate the rule referred to, and the admission of the inventory without more was error.

■ ■ Then, too, if this kind of evidence is to be received, common fairness requires that it should be permissible to meet it by proof that the person in question, though wealthy, was a careful trader and accustomed to look out for his own financial interest. Herein lies one of the dangers of admitting this kind of evidence. It results in encumbering the case with collateral issues that use up the time of the court and distract the attention of the jury from the real merits of the case. The defendant attempted to make use of the kind of evidence above referred to, but it was excluded.

From the fact that the court excluded "that line of testimony," we take it that the ruling was based upon the competency of the evidence and not that of the witness. The evidence should have been received. It was within the rule that when one party gives evidence of a collateral fact, it is permissible for his adversary to meet it by giving evidence of another collateral fact that tends to weaken or overcome the impression made on the minds of the jury by the first. *Fuller* v. *Valiquette,* 70 Vt. 502, 504, 41 Atl. 579; *Lamonda* v. *Parizo,* 90 Vt. 381, 384, 98 Atl. 980.

■ It was also error to allow the plaintiff to show that the Watkins family was wiped out. True it is that it appeared without objection that Dr. Watkins, his wife, and Eustace, all died before the trial. But it did not elsewhere appear that this comprised the entire family. In view of the character of the case and the way it shaped up at the trial, this irrelevant evidence should have been excluded. We might, on some records,

say that it was harmless, but not on this one. On the contrary, we think it was prejudicial.

*Judgment reversed, and cause remanded.*