KATHLEEN A. GERO *v.* THE JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY.

January Term, 1941.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed February 11, 1941.

*Theodore E. Hopkins* and *Theriault & Hunt* for defendant.

*Carver & Lawson* for plaintiff.

MOULTON, C. J. The plaintiff seeks to recover as beneficiary in three insurance policies issued by the defendant company upon the life of her husband, Edward W. Gero. These three policies were identical in amount, and were in force at the time at which the insured is claimed to have met his death. Each provided for the payment of double indemnity upon receipt of due proof that the insured, after the attainment of the age of fifteen and prior to the age of seventy, had sustained bodily injury solely through external, violent and accidental means, occurring after the date of the policies, and resulting directly and independently of all other causes, in his death, within ninety days from the date of such injury, while the policies were in force, except that no accidental death benefits would be paid if the death resulted from suicide, while sane or insane.

On the trial below there were two main issues: (1) Whether the insured was dead or had disappeared in life; (2) Whether, if dead, his death had resulted directly and independently of all other causes from bodily injury sustained solely through external, violent and accidental means, as provided in the policies. The verdict of the jury was in accord with the plaintiff's contention and was for the amount of the double indemnity. The defendant has excepted.

The insured was the purser on the steamer ''Ticonderoga'' a vessel of 892 gross tons burden, 222 feet long and licensed to carry 900 passengers with a crew of 28 members, operated on Lake Champlain by the Champlain Transportation Company. On the evening of July 15, 1938, there was an excursion from Plattsburg and Port Kent, New York, which terminated at Port Kent, where the last passengers disembarked, at 12:30 A.M. on July 16. The steamer then left for Burlington, Vermont, with only the officers and crew on board, arriving there at about 1:30 A.M. Some ten minutes after leaving Port Kent the insured handed to his step brother, Kenneth Miller, the mate, the latter's pay check, which Miller had given him for safe keeping the previous afternoon, saying that he had better take it. From that time on the insured was seen about the boat on various occasions by Miller, by the captain, Douglas Cameron, by the assistant engineer, Francis Snow, by the assistant manager of the company, Ross Matthews, and by the fireman, Glen Critchlow. When the Captain saw and spoke to him at 1. A.M. he was

cheerful and laughing. The last person to see him was Critchlow, who met and spoke with him on the main stairway, when the boat was about two and a half miles from Burlington, twelve or fourteen minutes before coming to the dock. The insured was then wearing his blue uniform, the coat of which had brass buttons with the initials of the company thereon, and braid upon the sleeves. He was carrying his uniform cap in his hand. At that time the boat was about one half or three quarters of a mile off shore. The lake at that point averaged 75 feet deep, with no noticeable current, and the bottom was smooth and free from any obstructions that might catch and hold a body. The night was calm and the surface of the lake quiet. The insured could dive and swim.

The purser's office was on the port side of the boat, aft. Directly opposite, on the starboard side, was a store room in which certain supplies were kept. The door to each room was equipped with a spring lock, of which the insured had the only keys and which he usually carried upon his person. Each room had an outside window, and the office had a grilled window opening into the main hall of the boat, through which tickets were sold. In the office were desks, or shelves used as desks, and a safe. The insured had a room on board, where he sometimes spent the night, and wherein he kept his civilian clothes and toilet articles. The captain also had a stateroom, next to the store room and separated from it by a thin partition.

As the steamer approached Burlington, Ross Mathews went into the purser's office to count and make up a report of the money taken by some slot machines which were on board, and for which he was responsible. When the boat docked, he closed the window and "pulled to the blind," to prevent anyone on the dock from seeing what he was doing. Having finished his task, he locked the money in the safe, and went out, leaving the light on, and locking the room by closing the door. The Captain, before he retired for the night, noticed the light shining through the glass of the ticket window, and supposed that the insured was in the office making up his accounts for the trip.

At 8 A.M. the insured did not appear, and, since there was work for him to do, a thorough search was made throughout the boat. The bed in his room had not been slept in although it had the appearance that someone had been lying upon it, and his

civilian suit, hat, overalls, clean underwear and stockings, pocket-book and toilet articles were found in the room. The light was still on in the purser's office, and the door locked. Kenneth Miller gained entrance by going along the "guard" or "chafing rail" a projection along the outside of the hull, 10 inches wide, and getting through the window, which he found open for about six inches, the blind being open about three inches. He found the key to the office on a ring with one or two others on one of the desks. Matthews had been working at the other desk the night before, and had not noticed whether the keys were there at that time. The store room, the window of which had been open all night, was entered in the same way by Critchlow, and on a shelf therein was found the insured's uniform cap, and under it several keys, one of which was the key to the room. Captain Cameron went to the insured's house, and received information from the plaintiff that he had not been home that night. The harbor in the vicinity of the dock was dragged with a grappling iron but nothing was found. Since he was seen and spoken to by Critchlow at approximately 1:48 A.M. the insured has never been seen or heard of, and no trace of him alive, or of his dead body, has been discovered. His accounts as purser had not been entirely made up, but on examination by another employee of the Company they were found to be correct. There was no shortage in the money in his care.

The plaintiff and the insured were married on May 29, 1933, and had one child, a girl, who was three years old at the time of her father's disappearance. Their domestic life was happy. The insured was very fond of his wife and daughter, whose photograph he carried about in his pocketbook and showed to his friends. He was in good health, of good moral character, temperate in habits, quiet, but cheerful in disposition, and without financial worries. He had been employed by the Champlain Transportation Company in one capacity or another for about three years. He was industrious, and conscientious, trusted by his employer, and well liked and popular among his fellow employees, by whom he was regarded as a fine fellow. Before becoming purser on the "Ticonderoga" he had served in the same capacity on the ferry operated by the Company between Burlington and Port Kent. He was transferred because the general manager wanted a trusted man on the larger boat. Upon being

notified of the transfer he refused to go, because he felt that he had not sufficient education to undertake the more complex duties that the change would entail, and left the service, but a few days later he reconsidered and took the position, in which he proved competent and which he liked. This was about two weeks before his disappearance. On the afternoon of July 15th, he received his pay check, which he cashed at the bank and took the proceeds home to his wife, telling her to pay some taxes that day. He left his house at about 3 P.M. after kissing his wife and daughter, taking with him some clean underwear and stockings, and saying that he would be back the next day. He was usually home at night, but when the boat was late in coming to the dock it was his custom to sleep on board. The plaintiff knew nothing of his disappearance until Captain Cameron called on her on the morning of July 16th.

To account for the manner in which the insured might have met his death the plaintiff put forth the theory that, having found himself locked out of either his office or the storeroom with his keys left inside, he had attempted to walk along the guard or chafing rail, had lost his balance and fallen into the water. This projection was three feet, seven inches below the sills of the windows and the windows were approximately two feet eight and one half inches high. The distance along the guard from the quarter deck, where one could get over the side to the guard, to the window of the office was four feet, and to the window of the storeroom nine feet and two and one half inches. Evidence was introduced, all of it subject to the defendant's exceptions, that on previous occasions the listing of the boat, or the wind, had caused the doors of the office, and storeroom, to swing shut, and, in default of a key, entrance had been gained by members of the crew by passing along the guard and through the window. A combing above the windows could be grasped to facilitate the process. Francis Snow testified that he had "walked the guard" to the office window on one and possibly two occasions while the boat was in motion, but had a man holding his hand while he did so. The weather was calm, or he would not have made the attempt. Whether it was done while the insured was on the boat, so that he could have known of it, did not appear, and there was no offer to show that this was so. In fact the inference is strongly otherwise, for the wit-

ness stated that by entering in this manner he got the keys which former pursers had left inside. Ross Matthews testified that on two occasions, to his knowledge, the door to the office had become shut, and that it had been necessary to "walk the guard" to get in; Francis Snow doing it one time and Glen Critchlow the other. The witness could not recall whether the boat was in dock or in motion on either occasion, and did not specify when the entrances took place. Captain Cameron testified that entrance to the storeroom and the office had been gained by some members of the crew in this way numerous times, but did not say whether before or after the insured had been employed as purser. There was no evidence of any motion of the boat or wind that would have caused either of the doors to shut on the night in question.

The exceptions to the admission of this testimony must be sustained. It is true, as the plaintiff contends and the defendant admits, that great latitude in the reception of circumstantial evidence is allowed in disappearance cases. *Tyrrell* v. *Prudential Ins. Co.,* 109 Vt. 6, 16, 192 Atl. 184, 115 A. L. R. 392. But while circumstantial evidentiary facts cannot be comprehended within any rule or brought under any classification, they must tend to connect the supposed evidentiary fact with the *factum probandum. State* v. *Ryder,* 80 Vt. 422, 426, 68 Atl. 652. The underlying principle is that the circumstances must be such as to induce a reasonable inference of the existence of the facts sought to be proved thereby. *Gilfillan* v. *Gilfillan's Est.,* 90 Vt. 94, 101, 96 Atl. 704. The fact that the doors to the office and storeroom had swung shut on other occasions and under certain conditions of wind and motion had no tendency to prove that they had done so on the night in question, at least without a showing that the same or similar conditions had then existed. And the fact that other members of the crew had, on previous unspecified occasions, "walked the guard" had no relevancy to the issue whether the insured had attempted to do so. It was *res inter alios,* and permitted the jury to indulge in speculation. The point comes within the principle laid down in *Hutchinson* v. *Knowles,* 108 Vt. 195, 203, 184 Atl. 705 and *State* v. *Dropolski,* 100 Vt. 259, 265, 136 Atl. 835, to say nothing of other decisions of this Court which it is not necessary to cite. The error was prejudicial and requires a reversal.

What we have just said makes it unnecessary to consider the defendant's exception to the failure of the court to comply with its request for an instruction that, on the evidence, the jury could not find that the death of the insured was caused by external, violent and accidental means by reason of walking the guard in an attempt to effect entrance to the purser's office. It may be noted, however, that this request was based also upon the undisputed evidence that when Ross Matthews went into the office, before the boat docked, the door was open, so that there was no occasion for the insured to walk the guard while the boat was on the lake.

Captain Cameron was asked on direct examination by plaintiff's counsel whether he knew of instances where there had been drownings in the lake and the bodies never recovered. The defendant objected and excepted on the ground that there were no such conditions accompanying the line of inquiry as to make it helpful in determining what may have happened under the circumstances appearing in evidence in the case on trial. The objection was overruled and the witness answered in the affirmative. He then testified, subject to that same objection and exception that, a few years before, two men had been drowned in Shelburne Bay, and their bodies never found; that the same thing had happened when a man named Bedell had been drowned outside of Burlington; and that there had been numerous drownings, and no recovery of the bodies, opposite Essex, New York.

■ The objection, however, did not reasonably indicate to the court the precise grounds upon which it was predicated, in that the conditions, the absence of which was claimed to make the evidence inadmissible, were not specified. *Morgan* v. *Gould,* 96 Vt., 275, 279, 119 Atl. 517; *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 147, 130 Atl. 758; *Higgins* v. *Metzger,* 101 Vt. 285, 296, 143 Atl. 394. "The trial court should always know what is excepted to. This court should always be able to see that a question argued here was distinctly raised below." *Kiley* v. *Rutland R. R. Co.,* 80 Vt. 536, 550, 68 Atl. 713, 718, 13 Ann. Cas. 269. This exception is unavailing.

■ On cross examination the witness testified that his knowledge of the instances of drowning outside of Port Kent was entirely what he had heard from others, and the defendant moved

to strike the testimony from the record. The motion was denied and the defendant excepted. Since this testimony was only hearsay the motion should have been granted, and the exception is sustained. See *McAllister* v. *Benjamin*, 96 Vt. 475, 493, 121 Atl. 263.

After the denial of the motion, further cross examination brought out the fact that the witness' knowledge of the Shelburne Bay drownings was also hearsay, but there was no motion to strike out his testimony as to these incidents. Since the record is to be construed against the excepting party (*Stoddard & Son* v. *Village of North Troy*, 102 Vt. 462, 470, 150 Atl. 148) no exception covering this matter is made to appear. Nothing is briefed concerning the loss of Bedell, but Charles Fabricco, a diver, called as a witness by the defendant, testified to this fact, and to his unsuccessful search for the body.

Ross Matthews, the assistant manager, having testified on direct examination to the refusal of the insured to take the position on the "Ticonderoga" and his later acceptance of it, and that the transfer was proposed because a trusted man was needed on the steamer, was asked on cross examination by defendant's counsel whether there had previously been a situation on the "Ticonderoga" where it was felt that the company had not had a trusted man. On objection, the question was excluded, subject to the defendant's exception. From the defendant's brief, it appears to have been the purpose to develop the fact that there had been tampering with the stock of liquor kept on the boat, and that the fear of a recurrence of this situation made the insured averse to taking the position and had an effect on his mentality, thus accounting in some way for his disappearance. But the witness had testified, in answer to repeated inquiries that he did not know of any loss of liquor, and had heard nothing about it. The scope and extent of cross examination rests largely in the sound discretion of the trial court and its ruling thereon is not revisable in the absence of an abuse thereof. *State* v. *Aronson*, 111 Vt. 129, 11 Atl. 2d. 214 and cas. cit.; *Shores* v. *Simanton*, 99 Vt. 191, 195, 196, 130 Atl. 697. In this instance we perceive no such abuse. It is also contended that the question was proper cross examination because it was connected with and grew out of the examination in chief, but wherein this was so is not pointed out and we do not search a transcript for

474

matters not called to our attention for the purpose of supporting an argument. *State* v. *Kaatz*, 92 Vt. 497, 500, 104 Atl. 873; *Ryan* v. *Orient Ins. Co.*, 96 Vt. 291, 306, 119 Atl. 423; *Davis* v. *B. & M. R. R.*, 86 Vt. 205, 208, 84 Atl. 818. This exception is not sustained.

The defendant took an exception to the charge in the following language: "We except to the court's failure to tell the jury directly in what circumstances the defendant is entitled to a verdict here. The court told them repeatedly in what circumstances the plaintiff could recover but did not give the balancing charge as far as the defendant is concerned." This is the equivalent of an exception on the ground that the court had failed to charge on all the material facts in the case, which has been held to be too general to reserve any questions for review. *Gilfillan* v. *Gilfillan's Est.*, 90 Vt. 94, 103, 96 Atl. 704. If such is the case it is the duty of counsel specifically to call the claimed shortage or error to the attention of the Court. *Cross* v. *Passumpsic Fibre Leather Co.*, 90 Vt. 397, 410, 98 Atl. 1010; *Dailey* v. *Bond*, 94 Vt. 303, 304, 305, 111 Atl. 394. It is said in defendant's brief that the Court charged, after defining and illustrating the phrase "preponderance of evidence," that, if the jury should not find this in the plaintiff's favor "the plaintiff has failed to establish her case"; that the jury were instructed to determine "whether the plaintiff has established this fact of death" and "to answer the question 'did Edward Gero drown on Lake Champlain on the morning of July 16?'"; and if they found that his disappearance was caused by drowning they should "next consider whether or not that drowning was accidental" without saying anything about disappearance otherwise. If the defendant desired any elaboration or modification of these statements, it should have been specifically called to the attention of the Court, under the rule which has been mentioned.

It is true that it is error "to give instructions that unduly emphasize issues, theories or defenses, either by repetition or by singling them out and making them unduly prominent." *Bucklin* v. *Narkwich*, 108 Vt. 1, 5, 182 Atl. 207, 209; *Morse* v. *Ward*, 102 Vt. 433, 436, 150 Atl. 132. But in applying this rule each case must stand on its own merits. *Bucklin* v. *Narkwich*, *supra*, p. 6. An examination of the charge fails to satisfy us that the criticism of it is well founded.

The defendant also took an exception as follows: "We except to the Court's charge that the jury should draw such logical conclusions from the evidence as it is possible for them to reconcile with such evidence. We claim that that charge is not adequate as given, and without more is misleading. We say that there should be instructions to the jury giving them some rules or standards for their guidance in reconciling their conclusions with the evidence." The court had charged, not once but several times, in the words quoted by counsel. The point of the objection is, not that the statement was inaccurate, but that it did not go far enough, and this contention is all that is for consideration. *Townshend* v. *Townshend,* 84 Vt. 315, 318, 79 Atl. 388. The evidence, of course, was entirely circumstantial and it was the duty of the court to explain to the jury the law applicable to a case where the evidence was of this nature. *State* v. *Ward,* 61 Vt. 153, 189, 17 Atl. 483. But circumstantial evidence had been defined and illustrated by a homely but understandable simile, and the principle of inductive reasoning therefrom had been explained. Its legal effect was, we think, made sufficiently clear. What more was claimed to be necessary or what further rules or standards should have been given was not pointed out in taking the exception. It is contended that the charge left it to the jury alone to determine what inferences were logical and possible, especially since the court also said that "the problems in a court of law are no different than they are in the store or out in the field or in the street." But it was not necessary to discourse upon the principles of logic; the reasoning to be employed in cases of circumstantial evidence is not necessarily that of cultivated and practiced minds, but that of ordinarily intelligent understanding. *Boguski, Admr.* v. *City of Winooski,* 108 Vt. 380, 387, 187 Atl. 808. This exception is not sustained.

The defendant excepted to the failure of the Court to comply with two requests for instructions, which were as follows: "In order for the jury to find for the plaintiff on either the issue of Gero's death or his death through external, violent and accidental means, the jury must find in the evidence something more than evidence which raises a mere conjecture, surmise, or suspicion that those things happened. That Gero met his death on July 16, 1938, or that his death occurred through

external, violent and accidental means must be at least the more probable hypothesis, with reference to the possibility of other hypotheses, in order for the plaintiff to recover on either of said issues.'' These requested instructions were in accord with the rule so often announced in the decisions of this Court. *Boguski, Admr.* v. *City of Winooski,* 108 Vt. 380, 387, 187 Atl. 808; *Johnson* v. *Burke,* 108 Vt. 164, 169, 183 Atl. 495; *Dooley* v. *Economy Store,* 109 Vt. 138, 142, 194 Atl. 375; *Perkins* v. *Vermont Hydro-Electric Corp.,* 106 Vt. 367, 399, 177 Atl. 631; *Durkee* v. *D. & H. R. R. Co.,* 106 Vt. 488, 494, 174 Atl. 921; *Quigley* v. *Wiley,* 107 Vt. 253, 262, 179 Atl. 206; *Goodwin, Admx.* v. *Gaston,* 103 Vt. 357, 364, 154 Atl. 772; *Ronan* v. *Turnbull Co.,* 99 Vt. 280, 287, 131 Atl. 788; *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 112, 130 Atl. 758; *Wellman, Admr.* v. *Wales,* 98 Vt. 437, 440, 129 Atl. 317. They were applicable to the circumstances of the case, and the refusal to give them was error.

Another exception was taken to the refusal of the court to give the requested binding instruction ''That on all the evidence in the case a finding that Edward W. Gero died on July 16, 1938, rather than disappeared in life is mere speculation and conjecture and that the jury has no right to make a finding of death, and that the court direct the jury to return a verdict for the defendant on this ground.''

There was no error in refusing this request. The fact of the death and the date of it could be shown by circumstantial evidence (*Tyrrell* v. *Prudential Ins. Co.,* 109 Vt. 6, 15, 192 Atl. 184, 115 A. L. R. 392; *Hurlburt* v. *Hurlburt's Est.,* 63 Vt. 667, 670, 22 Atl. 850), although, as we have seen, it must not be merely speculative or conjectural. See, also, *Aetna Life Ins. Co.* v. *Robertson,* 195 Ark. 237, 112 S. W. 2d. 436, 438. It is enough if the circumstances, taken together, reasonably tend to support the inference sought to be drawn therefrom. *Wellman, Admr.* v. *Wales,* 97 Vt. 245, 253, 122 Atl. 659; *Fadden* v. *McKinney,* 87 Vt. 316, 322, 89 Atl. 351. We have here no presumption of death after seven years absence unheard from, and, as the court said in the charge, the fact of death is not to be inferred from the disappearance alone. *Karet* v. *Chicago Fraternal Life Ass'n,* (Mo. A.) 22 S. W. 2d. 178, 181; *Hancock, Admr.* v. *Am. Life Ins. Co.,* 62 Mo. 26, 35.

According to some decisions the fact and time of death within

seven years of disappearance may be inferred only when the absentee is shown to have been exposed to some peril carrying with it the imminent danger of extinction, or when his health or habits were such as to render his continuance in life unlikely. See, for example, *Goodier* v. *Mutual Life Ins. Co.*, 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383; *Connor* v. *New York Life Ins. Co.*, 179 App. Div. 596, 166 N. Y. Supp. 985; *Penn. Mutual Life Ins. Co.* v. *Tilton*, 84 Fed. 2d. 10; *Fanning* v. *Equitable Life Assur. Soc'y*, 264 Pa. 333, 107 Atl. 715; *In Re Christin's Est.*, 128 Cal. App. 625, 17 Pac. 2d. 1068, 1071; *In Re Beasney's Trusts*, L. R. 7 Eq. 498. The great weight of authority, however, is to the effect that the inference may also be drawn from other circumstances than those above mentioned. In the leading case of *Tisdale* v. *Conn. Mut. Life Ins. Co.*, 26 Iowa 170, 96 Am. Dec. 136, 137, 138, it is said: "Any facts or circumstances relating to the character, habits, condition, affections, attachments, prosperity, and objects in life, which usually control the conduct of men, and are the motives of their actions, are competent evidence from which may be inferred the death of one absent and unheard from, whatever has been the duration of such absence. A rule excluding such evidence would ignore the motives which prompt human actions, and forbid inquiry into them in order to explain the conduct of men." In *Carlson* v. *Equitable Life Ass'n Soc'y*, 188 Minn. 43, 246 N. W. 370, 372, it was held that: "Even in the absence of evidence of exposure to some specific peril, a jury may be justified in finding that death occurred soon after an unexplained disappearance when the absentee was happily circumstanced and when his character and habits were such that there is no other probable reason for his disappearance or absence." And in *The Praetorians* v. *Phillips*, 184 Okl. 521, 88 Pac. 2d. 647, 652; *Spahr* v. *Mut. Life Ins. Co.*, 98 Minn. 471, 108 N. W. 4, 5; *Springmeyer* v. *Sovereign Camp*, 144 Mo. App. 483, 129 S. W. 273, 275; and *Sovereign Camp* v. *Piper*, Tex. Civ. App., 222 S. W. 649, 651, the unexplained disappearance of a person industrious and temperate in habits, attached to his family and happy therein, together with the want of all such motives as are supposed to influence men to abandon their families, was held to warrant the jury in drawing the inference that death took place at or about the time of disappearance.

The *Tisdale* case has been widely followed. Although not

cited, its doctrine, and almost its exact language, have been adopted in *Tyrrell* v. *Prudential Ins. Co.*, 109 Vt. 6, 16, 192 Atl. 184, 188, 115 A. L. R. 392, wherein it is said: "Any fact or circumstance relating to Tyrrell's character, habits, condition, affections, attachments, prosperity, and objects in life, which usually control the conduct of men, and are the motives of their actions, was, so far as it tended to characterize his disappearance or throw light on his intention, competent evidence on the ultimate question of his death." It serves no purpose to multiply citations, but reference may be made to *Coe* v. *National Council*, 96 Neb. 130, 147 N. W. 112, 40 Ann. Cas. (Ann. Cas. 1916B) 65, 66, L. R. A. 1915B 744; *Kansas City Life Ins. Co.* v. *Marshall*, 84 Colo. 71, 268 Pac. 529, 61 A. L. R. 1321, 1326, 1327; *Harris* v. *Security Benefit Ass'n*, 185 Wash. 25, 52 Pac. 2d. 329, 331; *Goodloe* v. *Met. Life Ins. Co.*, (Mo. App.) 115 S. W. 2d. 11, 13; *Hancock* v. *Am. Life Ins. Co.*, 62 Mo. 26, 34; *Ryan* v. *Tudor*, 31 Kan. 366, 2 Pac. 797, 799; *Eklund* v. *Supreme Council*, 152 Minn. 20, 187 N. W. 826, 828; *United States* v. *Hayman*, 62 Fed. 2d. 118, 1201; *Fidelity Mut. Life Ass'n* v. *Mettler*, 185 U. S. 308, 319, 22 Sup. Ct. 662, 46 L. Ed. 922, 930; *Rose* v. *United States*, 4 Fed Supp. 340, 342; 2 Wharton, Evidence, para. 1277; and see other cases cited in annotations 40 Ann. Cas. (Ann. Cas. 1916B) 72; 34 A. L. R. 1390, ff; 61 A. L. R. 1328, ff.

In view of the uncontroverted testimony concerning the insured's character, health, and domestic felicity, which has been mentioned earlier in the opinion, and which it is not necessary to repeat, we hold that the fact of his death and the approximate time of it, were questions for the jury to determine upon the evidence. In spite of the testimony of the diver, Fabricco, to the effect that to his knowledge, no bodies or persons drowned in Burlington harbor, or in that part of the lake traversed by the "Ticonderoga" since the time when the insured was last seen, had failed to be recovered, the fact the body of the insured has never been found is not conclusive to destroy an inference of his death. *Aetna Life Ins. Co.* v. *Robertson*, 195 Ark. 237, 112 S. W. 2d. 436, 438; *Pfeifer* v. *Supreme Tribe*, 191 Mo. App. 38, 176 S. W. 710, 713.

In the event that the court should refuse to give the instruction last mentioned the defendant requested the following two, the second being conditioned upon the failure to comply with

the first: "That on all the evidence in the case a finding that Edward W. Gero, if he died July 16, 1938, died through external, violent, and accidental means, is mere speculation and conjecture and that the court direct the jury not to return a verdict of double indemnity for the plaintiff;" and "On the evidence there is no issue for the jury as to the death of Edward W. Gero through external, violent and accidental means warranting recovery of double indemnity under the policies." Neither of these requests was granted and the defendant excepted. As each presents essentially the same question, they may be considered together.

In the trial court, and here, the defendant has argued that since the fact of death must rest upon an inference to be drawn from the circumstances, the inference of the manner of death must be based upon the prior inference, which is not permissible.

In 1 Wigmore on Evidence, (3rd Ed.) para. 41, the learned author says that the rule forbidding an "inference upon an inference" is unorthodox and fallacious, originally put forward without authority, and has been frequently repudiated by various courts; and that the judicial utterances that sanction it "must be taken as valid only for the particular evidentiary facts therein ruled upon." But, however this may be, the principle that a trier of fact may not legitimately find a fact by inferring its existence from another fact which has itself been found as the result of an inference, has been repeatedly approved and applied in the decisions of this Court. Thus, in *Laird* v. *State of Vermont Highway Dept.*, 110 Vt. 195, 199, 3 Atl. 2d. 552, where the claimant was found in a paralyzed condition, lying near the open main gate of the premises wherein he was employed as watchman, a finding by the commissioner of industries that from certain evidence he inferred the fact that the claimant had gone to the gate to close it, and from this fact he made the further inference that the exertion of walking to it, or the strain of attempting to close it, had brought about a cerebral hemorrhage, was held to be a violation of the rule. In *Merrihew's Admr.* v. *Goodspeed*, 102 Vt. 206, 214, 147 Atl. 346, 66 A. L. R. 1109, we held that to infer, from certain circumstances, that a child found himself in a position of real or apparent danger, and from this to infer that he ran out into the highway, where he was struck by a passing automobile, to escape

that danger, would be to base an inference upon a fact the existence of which rested upon a prior inference. In *Wellman, Admr.* v. *Wales*, 97 Vt. 245, 254, 122 Atl. 659 and 98 Vt. 437, 447, 129 Atl. 317, where the plaintiff's intestate was found lying unconscious on the highway with his damaged bicycle across his legs, there was evidence from which it could be inferred that he was struck by the defendant's automobile, but this inference was not permitted to support the further inference that the defendant was negligent. Other like decisions are *State* v. *Marini*, 106 Vt. 126, 146, 170 Atl. 110; *Breding* v. *Champlain Marine and Realty Co.*, 106 Vt. 288, 295, 172 Atl. 625; *Andrews* v. *Watkins' Est.*, 104 Vt. 321, 328, 160 Atl. 176; *Vermont Shade Roller Co.* v. *Burlington Traction Co.*, 102 Vt. 489, 150 Atl. 138; *Riggie* v. *Grand Trunk Ry. Co.*, 93 Vt. 282, 287, 107 Atl. 126; *Poronto* v. *Sinnott*, 89 Vt. 479, 483, 95 Atl. 647; and *Fadden* v. *McKinney*, 87 Vt. 316, 321, 322, 89 Atl. 351.

 The only inferences of fact which the law recognizes are immediate inferences from the facts proved. *Breding* v. *Champlain Marine and Realty Co., supra,* and cas. cit. But a given state of facts proven to the satisfaction of the jury may give rise to two or even more separate inferences, and in such a case one inference is not built upon the other, each is drawn independently from the same evidence. We have already tacitly recognized this principle in holding that on the evidence the jury were justified in finding not only the death of the insured but the approximate time of it. An illustrative case is *Harvey* v. *Fidelity and Casualty Co.*, 200 Fed. 925, in which the absentee was a passenger on a steamer on Lake Huron. Saying that he was not feeling well, he went to his stateroom, but when called to dinner two hours later, he was missing. His shoes, outer clothing, watch and pocket book were found in the room, but although a search was made throughout the boat, and the steamer turned back on its course, no trace of him was discovered. The shore was four miles distant, there was a stiff breeze, the water was rough, and the temperature nearly freezing. No other boat was in sight. It was held that the circumstances were such as to prove death by drowning. There are, of course, features that distinguish this case on the facts from the case before us, but the principle that the same evidence was sufficient to warrant the conclusion, not only that the man was dead, but that

he died by drowning, is applicable. The evidence here concerning the insured's character, habits, disposition and domestic life, and absence of any reason for abandoning his family was, as we have said, sufficient to justify the jury in drawing the inference that he was dead. The same evidence, plus the fact that when he was last seen, he was on board the boat, and on the lake, would, we think, also justify the inference that he was drowned. No serious claim seems to be made that the insured committed suicide, which, under the terms of the policy, would not have been a death caused by external, violent and accidental means. The burden of proving self destruction was conceded on argument to be upon the defendant. Whatever evidence there was that might be said to have had any bearing upon this issue was of so slight and inconclusive a nature and so easily reconcileable with the other evidence in the case that the jury might well consider it insufficient to sustain the burden. There was no error in the refusal of the requests.

Other exceptions taken by the defendant are covered by what has been said in this opinion and do not require separate treatment. All the questions raised have been considered.

*Judgment reversed and cause remanded.*