STATE *v.* JOSEPH A. MARINI.

October Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed January 13, 1934.

128

*Raymond Trainor* and *George M. Goddard* for the respondent.

*Lawrence C. Jones,* Attorney General, and *Jack A. Crowley,* State's attorney, for the State.

THOMPSON, J. The respondent was indicted under G. L. 7013, and convicted by a jury, of employing "means with intent to procure the miscarriage of Alberta Rowe, a pregnant woman, the same not being necessary to preserve her life, and who died in consequence thereof."

A few days after Miss Rowe died, Dr. C. F. Whitney the State pathologist, performed an autopsy on her body, and made a report of what he found to the representatives of the State.

■ Before the jury was impaneled, the respondent made a motion asking the court to order the Attorney General and the State's attorney to furnish his counsel with a copy of Dr. Whitney's report. The motion was denied, and the respondent was allowed an exception. The respondent concedes that the motion was addressed to the discretion of the court, but he contends that the court abused its discretion in denying it. The report was not received in evidence, it was not made a part of the record, and, as it is not before us, we cannot say that the court abused its discretion.

■ While the first two witnesses called by the State were testifying, the respondent requested the court to order the State to prove that there had been an abortion before further testimony was received, on the ground that it was prejudicial and unfair to him to permit witnesses to testify before the *corpus delicti* was proved. The court, on being assured by the State that before it rested it would prove that an abortion had been performed, denied the request, and the respondent was allowed an exception.

The respondent concedes that the rule in this jurisdiction is that the order of trial in criminal cases is a matter of discretion with the trial court, subject only to the right of the accused to be afforded a fair opportunity to meet and answer the case made against him. *State* v. *Magoon,* 50 Vt. 333, 338; *State* v. *Hopkins,* 56 Vt. 250, 262; *State* v. *Lawrence,* 70 Vt. 524, 529, 41 Atl. 1027; *State* v. *Pierce,* 87 Vt. 144, 150, 88 Atl. 740. In *State* v. *Magoon,* the leading case in this jurisdiction, this Court said: "In the trial of both civil and criminal causes, the order in which the testimony shall be admitted is one of prac-

■

tice rather than that of strict right, and may, in the discretion of the court, be varied to meet the exigencies of a given case, without error being predicable thereon unless it is manifest that the variance has operated to surprise, or in some way work a legal disadvantage to, the excepting party.''

The testimony of Dr. Whitney, who was the last witness but one called by the State, tended to prove the abortion. The respondent contends that because the court permitted the State to withhold his testimony until that late period in its case, he was deprived of a fair and full opportunity to meet the evidence produced against him, in that his counsel did not have a reasonable opportunity to study and ascertain the meaning of the doctor's testimony, and so be properly prepared for his cross-examination and that of other witnesses who had testified. The respondent did not move for delay or time, at the close of the doctor's testimony, in which to properly prepare for his cross-examination, but immediately began the cross-examination, and he was examined fully and at considerable length. Under such circumstances, the respondent is not in a position to complain that his counsel were not properly prepared for the cross-examination. *State* v. *Pierce, supra,* 87 Vt. page 151, 88 Atl. 740. Before the direct examination of Dr. Whitney began, counsel for the respondent, referring to the witnesses who had testified for the State, said: ''We understand these witnesses are going to remain in attendance, in court; we want to reserve the right to further cross-examine some of them when we are advised of the result of the autopsy. I presume they will stay here any way, won't they?'' The State's attorney assured counsel that the witnesses for the State were all present. It appears from the record that the respondent did not cross-examine any of the witnesses after the doctor had testified, and it does not appear that he desired to cross-examine any of them. It does not appear from the record that the respondent was deprived of a fair and full opportunity to meet the evidence produced against him. The exception is not sustained.

The respondent moved that the court direct a verdict in his favor at the close of the State's evidence. The motion was denied, and he excepted. This exception was waived by the respondent proceeding with the trial and introducing evidence. He renewed his motion for a directed verdict at the close

of all the evidence. The motion was denied, and he excepted. There are four grounds stated in the motion, but the substance of them is contained in the fourth ground, that "there is no evidence in the case that shows or has a tendency to show that the respondent employed any means with intent to procure the miscarriage of Alberta Rowe, a pregnant woman, as charged in the indictment."

The respondent is an osteopathic physician. He lives in Rutland and has an office in the Service Building on Merchants Row. Alberta Rowe was a woman thirty-three years old. She lived in Brandon and kept house for her father, Charles Rowe. A brother, Mark Rowe, lived in Brandon in his own home. Charles Rowe worked during the week in Rutland for Burditt Brothers and spent the week-end at his home in Brandon. Alberta had been keeping company with Harry Swan, who lived in Auburn, Maine, for about a year prior to her death. She had visited in Auburn, and Swan had visited at her home in Brandon. His last visit prior to March, 1933, was during the Christmas season of 1932. At some time following that visit, Alberta learned that she was pregnant and informed Swan of that fact by letter. He was responsible for her pregnancy. He left Auburn on March 30, 1933, traveling by automobile, and arrived at the Rowe home in Brandon in the morning of Friday, March 31. In the afternoon of that day, Swan and Alberta went to Rutland in his car. She went to the respondent's office alone and was there for some time. When she returned to the car, they went to Brandon and stayed at the Rowe home. The next morning, Saturday, April 1, they went to Rutland again, arriving there about eleven o'clock. Alberta went to the respondent's office and was there about an hour, when she returned to the car.

The respondent and his office assistant, Miss Jennie Cioffi, were the only witnesses who testified as to what took place in the respondent's office on those two occasions, except that Swan testified that Alberta told him that she was taking "light treatment."

It appears that the respondent used an appliance in his practice that is called a "light therapy lamp." It resembles a metal, oval cover with electric lamps in the top. When the lamps are turned on, their heat is thrown downward. It is also called

a "baker." The respondent testified that it was used for applying heat to a person's body for the purpose of relieving colds, inflammation, to induce perspiration, and "soft tissue radiation." A treatment with the lamp is called "light treatment," and when that expression is hereinafter used, it refers to treatment with the light therapy lamp.

The testimony of the respondent and Miss Cioffi tends to show that when Miss Rowe called at his office in the afternoon of March 31, she gave her name as Mrs. Alberta Rowe of Brandon Inn, Vermont, and her residence as state of Maine. She consulted with the respondent, and complained of having pains in her back and chest. After the consultation, she went to the examination and treatment room, where Miss Cioffi assisted her in baring her body just below the chest. The respondent then examined her chest and back with a stethoscope. He then directed Miss Cioffi to give her a light treatment, and to have her return the following morning at ten-thirty and at two-thirty in the afternoon. Miss Cioffi and Miss Rowe then went into another room where her body was bared to just below her hips. At that time Miss Cioffi noticed that Miss Rowe was wearing a sanitary belt with pad attached, and that she was menstruating. The therapy lamp was then applied to Miss Rowe's chest and back, the treatment taking about an hour. The respondent was not in the room during the treatment. Miss Rowe paid $5 for the consultation and treatment. The respondent was not in the office in the forenoon of April 1 while Miss Rowe was there, but Miss Cioffi gave her another light treatment, for which she paid $3.

Swan testified that on April 1 Alberta returned to the car about noon, and told him that "Marini wanted to see me, have a talk with me"; that later in the afternoon he and Alberta went to the respondent's office, and, while there, the respondent had the following conversation with him: "He said he could get her out of this trouble, he said it would cost around $125, and I said I didn't have $125; he said 'you can get it, can't you?' I said 'I don't know'; that is about all the conversation on that he and I had." He also testified that on that occasion the respondent told Alberta "to take a hot mustard bath Saturday night, and if the lights didn't do the job, do the trick, to come back Tuesday at five o'clock." Swan testified that Alberta

did not have a light treatment that afternoon; but the respondent and Miss Cioffi both testified that she did have such a treatment, and that Swan was not in the respondent's office on April 1. They returned to Brandon that afternoon, taking Charles Rowe with them, and arrived home about six o'clock.

Swan testified that after they arrived at the Rowe home on that afternoon, he and Alberta remained there until Tuesday, April 4; that from the time he arrived in Brandon on March 31, and until he left for Maine on April 4, he and Alberta were together all the time, and they did not visit any other doctor than the respondent.

He testified that in the afternoon of Tuesday, April 4, he and Alberta drove to Rutland and went to the respondent's office, arriving there about five o'clock, and saw the respondent. Alberta had a traveling bag. The respondent asked her if she came to stay, and she said, "Yes." He asked Swan: "You are going to pay for this aren't you?" and Swan replied, "I will do the best I can." The respondent asked him how much he could pay at that time. Swan told him he had only $42, and he then paid $30 to the respondent. The respondent said: "You can send the rest of it to me or bring it up Saturday when you come up." He told him that if he sent the money, to send it in cash. Swan also testified that he did not know where Alberta would be while he was away; that the respondent told him that the nurse would take her home Friday, if he did not get back. Swan went to Maine soon after this conversation, leaving Alberta at the respondent's office, and he did not return to Rutland until in the evening of Saturday, April 8.

It appears that on April 1, 1933, a Mrs. Velma Chase, a nurse, whom the respondent employed occasionally, opened a "convalescent home," so called, at her home on Baxter Street in Rutland.

The respondent, who referred to Alberta Rowe as Mrs. Rowe in his testimony, testified that she came to his office on April 4, some time after four o'clock; that "she complained of having had chills, she wasn't well, she was sick over all, over her chest, ached, and her back was no better"; that he examined her lungs and chest with a stethoscope, and took her temperature, which was 100.6; that she had a deep-seated cough and bronchial cold. At that time he diagnosed her trouble as grippe.

He testified that she told him that she was on her way to Maine with her husband; that they got down toward Bellows Falls when she started having chills and felt sick, and she didn't dare go any further, so she turned around and started back; that he asked her where she was going, and she said that perhaps she would go back to the Brandon Inn; that he told her that she could stay in Rutland and go to the convalescent home and it would be cheaper; that, at her request, he ascertained and told her what it would cost; that she went into the entrance hall, and he heard her talking with a man who he supposed was her husband, but learned later he was Swan; that she returned and said it would be all right, that she would go there; that he then called Mrs. Chase over the telephone and arranged with her to come to his office and get Alberta and take her to her home; that he saw the man go out, and in a few minutes he saw him return with a bag that looked like a suit case, which he left there; that the man then bid Alberta good-bye, kissed her, and left; that all this took place in the entrance hall; that the man did not go into his office; that he understood from their conversation that the man ''would continue the trip to Maine and come back Saturday after Mrs. Rowe.''

Mrs. Chase arrived at the respondent's office after Swan had started for Maine. She took Alberta home with her, and put her in bed where she stayed until she died. The respondent visited her late that afternoon, and once every day thereafter until she died. He directed Mrs. Chase to keep her on a liquid diet, keep hot pads on her chest and feet, and to give her insomital, which is a sedative for inducing sleep. The respondent, himself, gave her osteopathic treatment every day. Her condition remained the same, and the same treatment was given her, until in the early afternoon of Friday, April 7, when the respondent made his daily visit. He then observed that ''she wasn't so well''; she was running a higher temperature, 103; he heard râles, i.e., unnatural sounds, within the chest; and he thought it was the starting of a bronchial pneumonia. He then started a pneumonia serum treatment, which consisted of the injection of the serum every four hours. The previous treatment was continued, and he directed Mrs. Chase to give her morphine, ''if she got too restless.'' On April 8, there was no change in her condition, and no change was made in the treat-

ment. The respondent was called to Mrs. Chase's home in the early morning of Sunday, April 9. When he arrived there he found Alberta in a very critical condition. He gave her a hypodermic of strychnia, and used the osteopathic method of circulation, but she died in about twenty minutes.

The respondent testified that he never had any talk with Alberta about an abortion, and that he never performed an abortion on her. He denied that Swan had any talk with him on April 4 about getting Alberta or anyone out of trouble, or that Swan paid him $30 on that day. He testified that the condition of Alberta was such on April 4 that he thought she ought to go to a hospital or a convalescent home, and that he sent her to the home of Mrs. Chase because, being an osteopathic physician, he was barred from sending patients to the Rutland city hospital.

Dr. Whitney testified that the autopsy showed that Alberta had had a partial abortion, that is, that the fetus had been expelled from the uterus, but the afterbirth remained in the interior of the uterus; that the afterbirth then became dead tissue resulting in its infection which resulted in the infection of the uterus. He found small dark red nodular masses, hard and firm, the largest about three-quarters of an inch thick, and running down to very small in size, scattered throughout in the lobes of the lungs. A microscopical examination showed that they were "infarcts," which were caused by small pieces of blood clot with bacteria being carried through the blood stream from the infected uterus to the lungs and lodged there, setting up hemorrhage and some inflammation. He testified that, in his opinion, the cause of Miss Rowe's death was the infected afterbirth, the inflammation of the uterus, and the infected emboli in the lungs; that there was no indication of any kind of pneumonia; that she did not die of bronchial pneumonia; and that an abortion was not necessary to preserve her life.

Swan testified that he returned to Rutland Saturday evening, April 8, arriving there between 9:30 and 10 o'clock, and went directly to the respondent's office. In response to his inquiry, the respondent told him that Alberta had not returned to her home in Brandon, but was in Rutland, and he directed him to Mrs. Chase's home. He went there and saw Alberta for less than half an hour. He then went to a room in a house

nearby which Mrs. Chase had obtained for him for the night. In the early morning of April 9 he was called to the Chase home. Alberta was dead when he arrived there, but he did not know it. When he entered the room where the respondent and Mrs. Chase were, he asked what the trouble was, and the respondent told him that Alberta was going to die, and that he had a paper that he wanted him to sign. Swan replied: "I am signing no papers whatever." Swan then said that he was going to Brandon to get her father. The respondent said that he was going with him, to which Swan replied, "No, I am going alone." He left the house and got into his car, and the respondent followed him and got into the car with him. Swan pushed the respondent out of the car, and started for Brandon. When leaving Rutland, he took the road to Bellows Falls. He discovered his mistake when near the Fair Ground, turned around, and then drove directly to Charles Rowe's home in Brandon, arriving there about four o'clock, A.M. He tried to awaken Mr. Rowe, but without success.

He testified that while he was trying to awaken Charles Rowe, the respondent arrived in his car; that this was the first time he saw the respondent after he left him at the Chase home; that the respondent asked him to get into his car, and he did so; that the respondent then drove around in Brandon for some time, and, during the drive, the respondent had the following conversation with him: "He wanted me to say that we started, Alberta and I started for Maine and got down this side of Bellows Falls and she was taken with cramps and pains, and we turned around and came back, headed towards Brandon, and I asked her if she wanted to go to Brandon and she said, 'No,' she wanted to get back here to Marini's office, and went in there, and he said that she been in New York state to have an abortion performed. * * * He said would probably be people down to see me in Maine, and I would have to stick to that story, she told me she went into Brandon, went into New York state and had an abortion performed"; that following this conversation, the respondent drove to the home of Charles Rowe.

The evidence is uncontradicted that the respondent awakened Charles Rowe, and went into the house alone.

Charles Rowe testified that the respondent entered his home alone, introduced himself as Dr. Marini, and told him that his

daughter was dying, "barely possible that she is dead"; that she was at the convalescent home on Baxter Street. Rowe complained because he was not told that Alberta was in Rutland because he was working there all that week and could have gone to Baxter Street to see her, and he said that he thought there was "something wrong about this thing." The respondent replied, "You know she had a mechanical abortion performed." Rowe said, "Where?" The respondent said, "You know she went to Granville, New York." Just then Swan came upon the veranda, and the respondent turned to him and said, "Granville, ain't it, Swan?" and Swan said, "I am not familiar with the names of the towns in this vicinity, I think so." Rowe further testified: "Then Marini spoke about the death certificate, that it was essential that—I said, 'what did she die of?' Marini said, 'bronchial pneumonia'; I said, 'I thought you said she was operated on'; he said, 'we got to put in the certificate bronchial pneumonia'; I said, 'if she didn't die of that, put in what she died of'; he says, 'you know if these things are investigated, it causes paper talk and notoriety and doesn't get you anywhere'; I says, 'it is up to you, whatever you see fit to put in, you put in, if you know absolutely what she died of.' "

After this conversation, the respondent and Charles Rowe, leaving Swan at Charles Rowe's home, went to the home of Mark Rowe, and the respondent had a conversation with him. Charles Rowe testified that the conversation was substantially the same as that had at his home. He remembered that the respondent told Mark that his sister was dead.

Mark Rowe testified: "Dr. Marini said to me, 'your sister is dying,' and he says, 'been an illegal operation performed in Granville, Glens Falls, York state somewhere'; then he told me, 'she is dead'; I says, 'where is she?' he said, 'Spencer undertaking rooms'; then I turned to him, I said, 'Who are you?' he said, 'Dr. Marini of Rutland.' " Mark testified that the respondent appeared to be very nervous.

After the talk with Mark Rowe, the respondent drove to Rutland, taking Charles Rowe with him. They went to the respondent's office, and there he made out the death certificate, giving bronchial pneumonia as the cause of Alberta's death. They then went to Burditt Brothers mill. Swan, who had followed them from Brandon, went to Burditt Brothers mill and

waited for them there. Rowe testified that as they approached the mill, the respondent said: " 'We have got to impress upon this young man the financial expenses of the death of your daughter'; and he said, we have got to so impress it on him that he will get busy and get you some money'; I says, 'I can't talk with him about those matters'; he says, 'you come on in the office and we will three go in'; and he says, 'I will do the talking.' " They and Swan went into the office and, "Dr. Marini said that Swan was to go to Maine and to telegraph or to get back at the earliest possible moment to me two hundred dollars; Swan says, 'I can't talk, but I will do the best I can.' We came out of the office, stood on the scales a few minutes, and Dr. Marini told him he better be making tracks for Maine, get there just as quick as he could." Rowe was asked on cross-examination, referring to this occasion, "Marini didn't want him to go, did he?" and he replied, "God, I thought from the way he acted he was glad to have him go, the quicker, the better." Swan left for Maine soon after the conversation at Burditt Brothers mill.

The State's evidence tended to show that, prior to her visits to the respondent's office, Alberta was in good health, and that she had not been away from home for some time.

The respondent told a story that was entirely different from that told by Swan, and in some respects different from the testimony of Charles Rowe. He testified that when he told Swan in the early morning of April 9, that his wife was critically ill, and he believed that she was going to die, Swan exclaimed: "My God, what will I do?" that he replied that there was only one thing he could do, either telephone or telegraph her parents; that Swan said they did not have a telephone; that he told him he would have to telegraph, and Swan said, "No, no, I can't do that, I will go up and see them"; that he said, "Man, you can't go to Maine to see her parents and leave a dead woman here"; that Swan said, "Doctor, you don't understand, she isn't my wife, my name isn't Rowe, and she lives in Brandon." The respondent testified that was the first time he learned that Swan's name was not Rowe, and that Alberta was not his wife; that he was so dumfounded that he could not tell what was said after that; that he remembered that Swan left the house, and he followed him, saying, "Well, I am coming with you and you are going to Brandon to tell her father"; that he got into

Swan's car, but Swan did not want him to go to Brandon with him; that, after talking a while, he said, "Why don't you make a clean breast of the whole thing, tell me what this is all about"; that Swan then told him that he had sent this woman some money previous to this in a registered letter; that she was in trouble, had gone over the line into New York state and had something done; that they were leaving for Maine when they came up to see him, and she was scared and didn't feel well and she didn't dare make the trip; that he then suggested that he would go to Brandon and tell the woman's father the story just as Swan told him; that Swan said that he could do a better job if he (Marini) wasn't there; that Swan then opened the door of his car and gently pushed him out, and said, "Now let me alone, and I will be back with the old man"; that Swan started apparently for Brandon; that he started to follow him, he went some distance toward Brandon, and as he did not see Swan's car, he turned back and went on the road to Bellows Falls; that south of the fair ground he overtook Swan and stopped him by crowding him off the road; that Swan then turned around and went to Charles Rowe's home in Brandon, and he followed him.

The respondent testified that he went into the house alone and talked with Charles Rowe; that he told Rowe the story that Swan told him at the Chase home; that he told him that he had taken care of Alberta for bronchial pneumonia, but there was something wrong about it because Swan told him that there was something wrong with her and she had something done to her, and he told where Swan said it was done; that he called Swan, and Swan came in, and said that she went to Granville, New York, or some other town, he thought it was Granville, and had something done to her; that he told Rowe that Swan told him that he and Alberta had started for Maine on April 4, and got part way towards Bellows Falls, and she was taken sick and they came back and went to his office. The respondent testified that the talk with Swan at Burditt Brothers mill, about his going to Maine to get money to pay Rowe for funeral expenses, was had by Charles Rowe, and not by him, the respondent. Much of his testimony as to what was said and done on that Sunday morning is denied or contradicted by Swan and Charles Rowe.

140

The respondent testified that he never examined any part of Miss Rowe's body except her back and chest; that he did not learn that she was menstruating when she was at his office and at the home of Mrs. Chase until after he was arrested; that he treated her first for grippe, and then for bronchial pneumonia; that he put bronchial pneumonia as the cause of her death in the death certificate because he believed at that time she died of that disease; that he knew the symptoms of an abortion, but in his examination of Miss Rowe he never noticed the least symptom of an abortion.

He did not deny that he told Charles Rowe that Alberta had had a "mechanical abortion," or that he told Mark Rowe that an "illegal operation" had been performed. He testified that he might have told Charles Rowe that although there had been a criminal operation, the death certificate should say "bronchial pneumonia," but he did not remember of saying it. His testimony of what took place in his office on the several occasions when Alberta was there is corroborated by the testimony of Miss Cioffi.

■■ If only the evidence produced by the respondent was to be considered, it would have to be conceded that his motion for a directed verdict should have been granted; but, in support of the ruling of the court below denying the motion, we must consider the evidence in the light most favorable to the State. The evidence of the essential facts is conflicting, and it is impossible to reconcile it upon any ground. It is not our duty, in considering the motion, to compare the evidence which the State claims tends to prove the respondent's guilt with the evidence which he claims tends to establish his innocence. All we are called upon to do is to determine if there is legal evidence of relevant facts from which a jury could reasonably infer the guilt of the respondent.

A criminal abortion, that is, an abortion not necessary to preserve the life of the mother, is usually performed in secrecy, and, where the victim is dead, the evidence must, in most cases, necessarily be circumstantial—proof of relevant, collateral facts from which the guilt of the respondent can reasonably be inferred. The evidence of guilt in this case, if any, is circumstantial.

The respondent does not question in this Court that Alberta Rowe died as the result of an abortion, and that it was not necessary to preserve her life, so the only question is whether there is sufficient evidence in the case to warrant a finding by a jury that the respondent performed that abortion.

■ ■ Viewing the evidence in the light most favorable to the State, it can reasonably be inferred from the conversation that Swan and Miss Rowe had with the respondent, as testified by Swan, that the "trouble" referred to in those conversations was the pregnancy of Miss Rowe; that she went to the respondent to have an abortion performed; that he gave her "light treatments" for that purpose; that Swan agreed to pay the respondent $125 for performing an abortion; that he paid, and the respondent accepted, $30 in part payment for his services in performing the abortion; that Swan went to Maine to get the balance due the respondent, and he was to send it to the respondent in cash or bring it with him when he returned to Rutland on the following Saturday; that Miss Rowe returned to the respondent's office on April 4 for the purpose of having an abortion performed, or having one that had been partially performed completed.

There are other facts and circumstances in the case from which a jury could draw inferences unfavorable to the respondent.

Swan testified that he did not tell the respondent that Alberta went into New York state and had an abortion performed there; that he did not tell the respondent that he and Alberta started for Maine on April 4, and then returned to the respondent's office because she was sick; that those stories were not true; that he told them because the respondent told him that he must tell them and stick to them. If a jury found, as they might, that those stories were invented by the respondent to divert suspicion from himself, their introduction in evidence by him was a circumstance tending to establish his guilt. *State* v. *Totten*, 72 Vt. 73, 78, 47 Atl. 105.

It appears that the respondent did not know Charles Rowe, and never saw him until that Sunday morning when he went to his home and informed him of the death of Alberta. It may be, as he testified, that he went there as a matter of sympathy to break the news of Alberta's death to her father as gently as

possible; but a jury would be justified in drawing other inferences from his actions and conversations that morning. He admitted at the trial that it was an unusual thing for him to do. Swan objected strenuously to his going to Brandon, but he insisted on going there; and it appears from his own testimony that when he arrived at the home of Charles Rowe, he left Swan outside the house, that he awakened Rowe, went into the house, introduced himself, and talked with Rowe alone. It fairly appears from the evidence that during the entire morning Swan never had an opportunity to be alone with Charles Rowe and talk with him, and that the respondent did not intend that he should have such an opportunity. The respondent did all of the talking with Charles Rowe except when he called upon Swan to corroborate his statement that Alberta had an abortion performed in New York state.

It seems strange, if the respondent had treated Alberta for grippe and bronchial pneumonia only, and had never seen any symptom of an abortion in his examinations of her, and if he believed that she died of bronchial pneumonia, that in his conversations with Charles Rowe and Mark Rowe he should stress the fact that Alberta had had an abortion performed in New York state. The tendency of the stories he told the Rowes, as testified by them, was to divert suspicion of the performance of an abortion on Alberta from him, and to cast it upon some unknown person in another state. If a jury found, as they might, that much of the testimony of the respondent of what was said and done that morning was false and fabricated, that was a circumstance from which they might infer his guilt. *State* v. *Williams*, 27 Vt. 724; *State* v. *Magoon*, 68 Vt. 289, 35 Atl. 310; *State* v. *Bradley*, 64 Vt. 466, 24 Atl. 1053. It fairly appears from the testimony of Swan that the respondent expected that the death of Miss Rowe would be investigated, and that he directed Swan to tell a story that would divert suspicion from the respondent. There is evidence that the respondent was very nervous that morning, and that he appeared desirous of getting Swan out of Vermont and into Maine as quickly as possible. It can also be inferred that the respondent put bronchial pneumonia as the cause of Alberta's death in the death certificate for the purpose of preventing an investigation of the true cause of her death.

That the respondent knew in the early morning of April 9, that an abortion had been performed upon Alberta appears from his own testimony. So far as it appears in the record, there were only two sources from which he could have acquired knowledge of that fact. Either he performed the abortion, or Swan told him that Alberta had had an abortion performed. If a jury should find, as they might, that Swan did not tell the respondent that Alberta had had an abortion performed, the inference is strong, if not conclusive, that the respondent, himself, performed the operation upon her. There was sufficient evidence on which to submit the question of the respondent's guilt to the jury.

 After both sides rested and before the arguments began, the respondent moved that the case be reopened and that he be permitted to introduce some newly discovered evidence. He stated that the witness would testify that he was a friend of Charles Rowe; that about a week after Alberta was buried, Charles Rowe invited him to his home, and while he was there he had a conversation with Rowe about Alberta; that in the course of the conversation Charles Rowe said: "We started for Maine and got this side of Bellows Falls and she got so bad we had to turn back and take her to the hospital." The motion was overruled and the respondent was allowed an exception. There is no error here. If the newly discovered evidence was offered to prove the fact, it was inadmissible, because it was purely hearsay. If it was offered for the purpose of impeaching Charles Rowe, it was inadmissible, because no foundation for his impeachment had been laid.

 The State's attorney said in argument to the jury: "If there ever was a man that came into this court room and sat at this table whose hands were wringing with blood, it is this respondent, Joseph Marini." To this statement the respondent was allowed an exception. The Court immediately instructed the jury that they should pay no attention to that remark; that the State did not claim that the respondent's hands were wringing with blood; and the State's attorney said: "The State intended that as a figure of speech and not as an actual fact, and apologizes to the court and jury and desires to withdraw it at this time." The court, in its charge to the jury, said: "Something has been said in argument both by the State and

144

the respondent's counsel as to passion and prejudice. Gentlemen, in the decision of this case you are dealing with the evidence produced in court. Passion, prejudice, pity, have no place in your deliberations and will not be considered by you. * * * And from these circumstances, having decided what the facts are, you will arrive at your conclusion uninfluenced by passion or prejudice and free from any bias." The argument was improper, but the mischief was cured by its prompt withdrawal and by what the court said to the jury then and later in its charge. *State* v. *Stacy,* 104 Vt. 379, 404, 160 Atl. 257. We cannot assume that the jury did not give due weight to what the court said. *State* v. *Foss,* 100 Vt. 32, 134 Atl. 636. The exception is not sustained.

 The respondent was allowed an exception to the apology made by the State's attorney. He argues here that the objectionable remark was not withdrawn by the State's attorney, because he said he "desires to withdraw it." This objection was not made below, so we will not consider it here. When the exception was allowed, the court below said: "You want exception because the State's attorney apologizes for it?" and counsel said "Yes." The court then said: "You may have an exception to the apology made by the State's attorney."

 The respondent was allowed an exception to the following statement made by the State's attorney in argument: "It is true you can't bring Alberta back, but you can see justice is done." We see nothing improper or prejudicial in that remark. Counsel for the State are entitled to some latitude in the argument of a case as well as counsel for the respondent.

 The respondent excepted to the failure of the court to charge as follows:

> "The evidence in this case upon which the State relies for conviction is all circumstantial evidence, and while that class of evidence, if of sufficient strength and believed by the jury, will warrant a conviction of the respondent, yet if the circumstances proved only create a suspicion that the respondent may be guilty of the offense as charged they will not warrant a conviction."

The court, when instructing the jury about circumstantial evidence, told them that they could make "no presumption or draw no conclusion or inference from circumstances which are not proved to your satisfaction beyond a reasonable doubt. Circumstantial evidence is entitled to the same weight as direct evidence if it is of such a character as to satisfy you beyond a reasonable doubt and to exclude every reasonable hypothesis except that the respondent is guilty. Therefore, if you are able to reconcile the circumstances in this case upon any theory presented by the evidence consistent with the respondent's innocence, it is your duty to do so." While the language is not the same, we think that the substance of the request is embodied in the foregoing part of the charge. This exception is not sustained.

· We have considered all the questions briefed by the respondent, and we find no error in the proceedings of the court below.

*Exceptions overruled. Let execution of sentence be done.*

## ON MOTION FOR REARGUMENT*

The respondent has filed a motion for reargument. He argues that Alberta Rowe was or was not pregnant on March 31; that if she was not pregnant (because an abortion had been performed upon her before that time), then Swan went to Brandon on March 31 to carry her to the home of people named Farr, as testified by the respondent as follows. "The father asked Swan why he had not told him something about it and Swan said that they were going to Maine and she was going there with him and they were going to visit some people by the name of Farr and there rest up." Her father and Swan both testified in rebuttal that they did not have such a conversation.

The respondent argues that certain testimony of Charles Rowe tends strongly to show that Alberta was not pregnant on March 31. He refers to Rowe's testimony that on Sunday, April 2, Alberta wore a heavy coat all that morning until he left for Rutland after dinner and that it appeared funny to

---

* Opinion on motion for reargument filed January 15, 1934.

him. The respondent says that this testimony can be better understood by first referring to the testimony of Dr. Whitney. Dr. Whitney testified that a woman with an infected after-birth is "quite apt" to have chills which might be brought on by infection. The respondent argues that Alberta must have felt chilly and cold else she would not have worn a heavy coat in a warm house that morning; that, in the light of Rowe's testimony and common experience, it cannot reasonably be inferred that she was wearing the coat because of a cold; that the reason it seemed "funny" to him, "no doubt" was because he knew that she did not have a cold and he was suspicious of her physical condition; "that, hence, it is fair to infer that Alberta at that time was feeling the effects of the infection that eventually caused her death; that if the infection was the cause of her being chilly and feeling cold on April 2, then, and in that case, Miss Rowe must have been aborted some time prior to April 2."

This is an ingenious argument, but the trouble with it is that no inference can legitimately be based upon a fact the existence of which in itself rests upon a prior inference. The only inferences of fact which the law recognizes are immediate inferences from the facts proved. *Vermont Shade Roller Co.* v. *Burlington Traction Co.*, 102 Vt. 489, 499, 150 Atl. 138, and cases cited.

Even if it could be inferred from the testimony of Charles Rowe that Alberta was suffering from chills, there is no fact proved from which it can be inferred that those chills were caused by infection resulting from an abortion. It is evident that there was nothing about her condition that morning that caused her father to believe she was ill, as he testified that he did not notice that she was not well, and that she did not complain of chills and being cold. As we say in the opinion, the evidence of the State tended to show that prior to her visits to the respondent's office, Alberta was in good health and had not been away from home for some time.

Dr. Whitney testified that as soon as the afterbirth became infected, the infection passed to the walls of the uterus and then from the uterus to other parts of the body; that it would take some time for the infection to "incubate" or start.

The following questions were then asked and answers received:

"Q. What is the average time for incubation in a condition of that kind? A. I couldn't say what the average time would be. Q. Well, don't physicians ordinarily speak of things as average, they can't say definitely because some, at sometime you may have one wouldn't incubate in perhaps a week, and then you would have one in two weeks, perhaps one in three days, so you average— A. They usually expect infection is going to show up by such things as temperature, three days to a week."

The respondent argues from this testimony that if it takes three days to a week for the infection "to show up," some time must be allowed for the infection to develop sufficiently to cause death; that Dr. Whitney's testimony does not tend to show the additional number of days expected to elapse before death ensues; that it does tend to show, however, that in all probability a sufficient number of days did not elapse between April 4 and April 9, the day on which Miss Rowe died, to allow the infection to incubate and develop sufficiently to cause her death.

It is true that the doctor did not testify as to the number of days within which death may be expected to occur after infection "shows up"; but, in the light of other evidence, we do not think it is a necessary inference from his testimony that sufficient time did not elapse between April 4 and April 9 for the infection to cause death.

There is evidence from which a jury could infer that Miss Rowe died as the result of an abortion performed on April 4. On April 7, the third day after she entered Mrs. Chase's home, she had a temperature of 103. That this was a symptom of infection appears from the testimony of Dr. Whitney; and it appeared at a time when the doctor said it might be expected to appear. The respondent testified that on that day "she wasn't so well"; he heard râles, i.e., unnatural sounds within her chest. Mrs. Chase testified that on that day Miss Rowe seemed to have pains in her back and lungs; that it was the first time she had noticed that she had pains in her lungs. That the pains in her lungs were due to infection that had been car-

ried from the infected uterus into the lungs fairly appears from the testimony of Dr. Whitney. Mrs. Chase testified that on April 7 Miss Rowe's temperature was 103, that it dropped down to 101 or 102 most of the time; that on April 8 it was the same. Dr. Whitney testified that after the uterus was infected from the infected afterbirth and the infection was passing through other parts of the body, the temperature might be around 100 to 102 or 103, that it "usually goes up and down somewhat in the twenty-four hours." Miss Rowe's condition grew worse during the night of April 8. The respondent was called to the Chase home early in the morning of Sunday, April 9. He arrived there at two o'clock, and Miss Rowe died about twenty minutes later. It is conceded that an abortion was the cause of her death.

It fairly appears from the quoted testimony of Dr. Whitney upon which the respondent relies, and from the evidence to which we have just referred, that the symptoms of infection in Miss Rowe's lungs caused by the infection of the afterbirth, which resulted in her death, developed in the time and sequence that might be expected from an abortion performed on April 4. That evidence, when considered with the evidence of the admittedly unusual conduct of the respondent at Brandon and Rutland in the morning of April 9 after the death of Miss Rowe, as set forth in the opinion, was sufficient to justify the inference that the respondent performed the abortion that resulted in Miss Rowe's death. That inference is strengthened by the uncontradicted testimony of Charles Rowe that the respondent told him that there had been a "mechanical abortion." That there is such an abortion as a "mechanical abortion" appears from the cross-examination of Dr. Whitney. While the respondent testified that Swan told him that Miss Rowe went into New York state and had an abortion performed there, he did not testify that Swan said a "mechanical abortion." That expression was used only by the respondent. So far as it appears from the evidence, the respondent's knowledge that a "mechanical abortion" had been performed upon Miss Rowe could have been acquired only from the fact that he, himself, performed it.

Respondent's counsel says that he is inclined to believe that certain evidence on which he relies must have been misapprehended or overlooked by the Court. Such a belief is not war-

ranted. We have given careful consideration to all of the evidence in our decision of the case. But, as we say in the opinion, it was not our duty, when passing upon the respondent's exception to the denial of his motion for a directed verdict, to compare the evidence, but, rather, in support of the ruling below, to consider it in the light most favorable to the State.

We have carefully considered all of the grounds of the motion on which the respondent asks for a reargument, but find nothing that warrants the granting of the motion.

*Motion for reargument denied. Let full entry go down.*