LESLIE E. DURKEE *v.* DELAWARE & HUDSON RAILROAD CO.

May Term, 1934.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and SHERBURNE, JJ.

Opinion filed October 2, 1934.

*George M. Goddard* for the plaintiff.

*Marvelle C. Webber, James P. Leamy,* and *Christopher A. Webber* for the defendant.

SHERBURNE, J. The plaintiff seeks to recover for injuries sustained on January 16, 1933, in an accident at the so-called Pleasant Street grade crossing in the Village of Fair Haven. At the close of the plaintiff's evidence, the defendant moved for a directed verdict in its favor on seven grounds which may be summarized as follows: That the defendant was not guilty of negligence which proximately caused the accident, that the plaintiff was guilty of contributory negligence, that he assumed the risk, and that the evidence did not warrant the submission of the case to the jury on the last clear chance doctrine. The motion was granted and the plaintiff excepted.

It was admitted that defendant's train gave the statutory signals and no claim was made that the automatic bell located at the crossing was not ringing although the plaintiff did not hear it. The allegations in the declaration only present a case of liability under the last clear chance doctrine.

Taken most favorably for the plaintiff, the evidence tended to show the following facts: Pleasant Street is substantially level and is in a residential section. It intersects the main cement highway through Fair Haven at the brow of a hill and runs north and south. Defendant's railroad runs east and west and crosses this street about two hundred feet southerly of the intersection. On the west side of the street between the intersection and the crossing is located the Seager house. Between this house and the railroad is the Seager barn. These buildings shut off the view of a train approaching from the west from one traveling southerly toward the crossing until he has nearly passed the barn.

Plaintiff had passed over this crossing many times. He knew it was about train time and was looking for the train. He had observed that the main highway and Pleasant Street were covered with ice. He was driving a 1924 Model T Ford sedan.

It had two speeds, high and low, and was driven by a hand throttle. The day was cold and the windows were closed. He had been traveling upon the main highway and, just before turning into Pleasant Street, had stopped to let another car pass. He then entered Pleasant Street in low at a speed of five to six miles per hour. In front of the Seager house he shifted into high and proceeded at a speed of ten to twelve miles per hour past the barn until he reached a point 65 to 70 feet from the crossing where he could look by the barn, and testified that he saw defendant's passenger train approaching from the west, his right, a little over 650 feet from the crossing. Immediately upon seeing the train he "put on the gas" and turned to the right in an attempt to drive upon the Seager property. As he changed the course of his car, its rear skidded along the street to the left and he immediately turned to the left across the street to enter a lot on the other side, but his front wheels skidded along on the ice and he struck a slight rise and then a slight decline toward the track and his rear end skidded toward the train and the right rear side was hit by, or collided with, the train. From a fair construction of plaintiff's testimony, it is apparent that the automobile and the train reached the crossing at about the same time. When asked if the train was on the crossing when he got there, he replied: "Close to it, sir, I couldn't tell you." When asked if he slid against the train, he replied: "I don't know, sir." He didn't know how wide he opened his throttle, but testified that his car started going faster when he did so. He testified that he didn't think that he could have stopped on the icy street before reaching the crossing at the speed he was traveling. Later when asked if he didn't have quite a good deal of time to slow up and stop before the train would reach the crossing if 650 feet away when he saw it, he replied: "Perhaps so, but I done what came into my mind at the present moment." When asked if he could explain why he should be so frightened and do as he did, he replied: "Well, it was so icy going, my idea was to get off the road if I could."

■ Under these circumstances we think that the plaintiff assumed the risk of being unable to stop when he shifted from low to high and increased his speed, and was guilty of negligence which would bar his recovery in this action unless he can prevail under the doctrine of the last clear chance. *Goodwin, Admx.* v. *Gaston et al.*, 103 Vt. 357, 366, 367, 154 Atl. 772.

492

■ ■ All the testimony as to the speed of the train came from defendant's trainmen called as witnesses by the plaintiff. In the direct examination of the conductor he testified that the train was late and left Whitehall eight miles away at about 3.22 p.m. and arrived at the place of the accident at 3.25. On cross-examination he admitted that he was mistaken about the time of leaving Whitehall and that the train was traveling at about its regular schedule speed of thirty miles per hour. His last statement was clearly a correction of his first and there was nothing to throw doubt upon it as such. Consequently, we must accept the correction. *Piper* v. *Oakland Motor Co.*, 94 Vt. 211, 214, 109 Atl. 911. The engineer testified to a speed of thirty to thirty-five miles per hour at the crossing. If the plaintiff was only 65 to 70 feet from the crossing when he saw the train and the train was over 650 feet away, as he testified, then for both to reach the crossing at the same time the train must have been traveling approximately ten times as fast as the plaintiff or over 100 miles per hour. This is absurd. The plaintiff was admittedly confused. He "put on the gas" and increased his speed. True, he did not drive directly toward the crossing, but the reasonable inference is that he must have gotten there about as soon as if he had done so had he continued at his former speed. Consequently, with the train traveling at thirty-five miles per hour, it must have been much nearer the crossing than the plaintiff testified. With the train traveling at the most only three and one-half times as fast as the plaintiff, any reasonable construction of the testimony could not place the train more than 250 feet from the crossing when the plaintiff was only 65 to 70 feet away. In these circumstances it is idle for the plaintiff to testify that he saw the train when it was over 650 feet away, since the countervailing evidence so preponderated that reasonable men could fairly draw but one conclusion, and a verdict in his favor predicated upon such testimony could not stand. *Goodwin, Admx.* v. *Gaston et al., supra; Wellman* v. *Wales,* 98 Vt. 437, 448, 129 Atl. 317; *Spaulding* v. *Mut. Life Ins. Co.,* 94 Vt. 42, 57, 109 Atl. 22; *Neill* v. *Ward,* 103 Vt. 117, 158, 159, 153 Atl. 219.

As the train approached the crossing, the track curved to the left and the engineer seated at the right of the cab, the opposite side of the train from which plaintiff was approaching, could not see any of the crossing past the front of the engine,

but, as the train neared the crossing, the track straightened so that he could see a part of the crossing, but not the left rail. At the time of the accident the steam had been shut off and the train was drifting to the station at Fair Haven. The fireman had been sitting on his seat at the left of the cab looking ahead along the track until he got up and stood in front of the fire door to turn on the blower valve to release the steam through the smoke stack to carry away the gas and smoke. He was passing over the crossing when he turned the valve. He could not state the distance to the crossing when he got up, but said it was near, and in answer to a direct question if it might have been 500 to 600 feet said: "No." After the accident, the emergency brake was applied and the train brought to a stop in 600 to 700 feet thereafter.

Most of our cases upon the doctrine of the last clear chance have been recently listed in *Bates* v. *Rutland R. R. Co.*, 105 Vt. 394, 403, 165 Atl. 923, 926, where it is stated: "The doctrine presupposes a perilous situation, created or existing through the negligence of both plaintiff and defendant, but assumes that there was a time after such negligence has occurred when the defendant could, and the plaintiff could not, by use of the means available, avert the accident." In the instant case there was no evidence nor allegation in the declaration that the defendant was negligent prior to the time that it is claimed it should have discovered the plaintiff approaching the crossing, so perhaps the definition given in *Miller* v. *Central Vermont Ry. Co.*, 95 Vt. 69, 72, 113 Atl. 524, 525, better fits the situation: "When the negligence of the defendant is proximate, and that of the plaintiff is remote, an action can be sustained. Therefore, if there be negligence on the part of the plaintiff, yet, if at the time when the injury is committed it might have been avoided by the defendant by the exercise of reasonable care and prudence and could not then be avoided by the plaintiff by the exercise of such care and prudence, an action will lie. * * * At the moment the plaintiff's ability to avoid the accident ceased, his negligence became remote; and that of the defendant then became proximate if at the same moment or later it could by the exercise of reasonable care and prudence have avoided the accident, and failed to do so."

██ ██ Assuming, but not deciding, that the fireman should have neglected his other duties to keep a constant lookout for

494

approaching traffic from his side of the train, he should have seen the plaintiff approaching the crossing about as soon as the plaintiff saw the train, but he would not then have been called upon to take action for the plaintiff's safety until he appreciated his peril or it was so obvious that he would be taken to have appreciated it. *LaMountain's Admx.* v. *Rutland R. R. Co.*, 93 Vt. 21, 25, 106 Atl. 517. For a time after he should have seen the plaintiff, he would have had the right to assume that he would stop or drive off the road and not get upon the crossing. *Bates* v. *Rutland R. R. Co.*, *supra*, 105 Vt. page 404, 165 Atl. 923; *LaMountain's Admx.* v. *Rutland R. R. Co.*, *supra; Guilmont's Admr.* v. *Central Vermont Ry. Co.*, 78 Vt. 185, 188, 62 Atl. 54.

There was no evidence as to how quickly the train could have been stopped or its speed slackened, other than that the train did stop in 600 to 700 feet after the emergency brake was applied. Disregarding the time the fireman should reasonably have taken after seeing the plaintiff to appreciate his peril, the time required for the fireman to signal to the engineer, and the time for the engineer to apply the emergency brake, and assuming that the emergency brake had been applied immediately after the plaintiff could have been seen by the fireman had he been at his lookout station, the train, so far as appears, would have gone over the crossing at considerable speed and not have stopped until well beyond it. Under such circumstances it is clear that a collision could not have been prevented unless, because of the slowing of the train, the plaintiff might have had time to save himself. No one can say with any assurance that he could or would have done so. A verdict in his favor under such circumstances would necessarily have been based upon speculation and conjecture and could not stand. *Bates* v. *Rutland R. R. Co.*, *supra*, 105 Vt. page 404, 165 Atl. 923; *Goodwin, Admx.* v. *Gaston, supra*, 103 Vt. page 364, 154 Atl. 772; *Wellman* v. *Wales*, 97 Vt. 245, 255, 122 Atl. 659; *Wellman* v. *Wales*, 98 Vt. 437, 440, 129 Atl. 317; *Cummings, Admr.* v. *Town of Cambridge*, 93 Vt. 349, 352, 107 Atl. 114; *Gilman* v. *Central Vermont Ry. Co.*, 93 Vt. 340, 349, 107 Atl. 122, 16 A. L. R. 1102.

*Judgment affirmed.*