ADA MEYETTE *v.* CANADIAN PACIFIC RAILWAY COMPANY.

February Term, 1939.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed May 2, 1939.

*Samuel E. Richardson* for the plaintiff.

*Hubert S. Pierce* for the defendant.

JEFFORDS, J. This is an action to recover damages received in a railroad crossing accident which happened in December, 1936, in the village of Lyndonville.

The crossing is in the easterly part of the business section of the village. The rails of the main line of the defendant run approximately north and south. The crossing is 38 feet long (north and south) and 6 feet wide. It had no warning bell nor gates but there was the usual crossing sign.

Depot Street, which runs east and west, intersects the crossing at right angles. East of the crossing Williams Street intersects Depot Street but at a varying angle, that part south of Depot Street being farther to the east than the part north of the same. The part to the north is called North Williams Street and that to the south, South Williams Street. It is from 75 to 80 feet from the center of the crossing to the center of South Williams Street and 46 feet from the same point to the center of North Williams Street, and 36 feet from the same point to the westerly edge of North Williams Street.

The plaintiff had been invited to ride in the automobile of one Huntoon to St. Johnsbury. There were six persons in the car, a Chevrolet sedan, the plaintiff riding on the rear seat. It came along Depot Street proceeding in a westerly direction. After it passed a small hotel which was 120 feet easterly from the center of the crossing the driver of the car had a clear view 270 feet along the tracks to the north. This view increased as he approached the crossing. The time was about 3 o'clock in the afternoon and the day was clear.

The car as it proceeded towards the crossing from the vicinity of the hotel was traveling at a slow rate of speed generally estimated to be from 10 to 12 miles per hour. Huntoon was familiar with the crossing as was the plaintiff.

Huntoon's version of his actions is in substance that as he passed the hotel he looked to the south to see if the express train was approaching which was due at about that time. That when so looking the plaintiff called "train" and he thought she was calling him by his nickname "Fame", so he turned his head to the rear to see if anything was wrong. At that time his car was about the length of an automobile west of South Williams Street. He testified on cross-examination that when the plaintiff called out, his car had passed the southerly part of Williams Street and that it was about one half way from Williams Street to the crossing when his wife called. That immediately after the first call his wife, who was sitting on the front seat with him, said "train" and he then looked to the north for the first time and saw the train

with the engine about at the baggage room north of the station, and he thought the train was drawing off from No. 1 siding, which is also north of the station, and coming very slowly, and he thought he had plenty of time to get across and stepped on the gas to get across, and he thought he was across when he heard the engine strike the rear of his car. That his car was just past South Williams Street when he glanced to the north after his wife had called out and at that time the speed of his car was from 10 to 12 miles per hour. That his chains were on and his brakes were good at the time and that he could have stopped his car very suddenly at that speed and could have stopped it at any time between the time that he saw the train and the time when the car came onto the crossing either by application of the brakes or by driving the car into the snow, but he testified that he did not believe that he could have turned the car down North Williams Street when he saw the train after having passed South Williams. That he did not apply his brakes at any time and continued to watch the train as he approached the crossing. That the speed of his car was greater when it went over the crossing than when at Williams Street but he could not tell how much greater. That if he had looked he could have seen the train at any time after his car passed the hotel.

Several other witnesses testified as to the speed of the car as it approached the crossing and all substantially corroborated Huntoon on this point. They generally gave the same rate and several testified that it was going so slowly that they thought it was going to stop.

There was some evidence introduced by the defendant indicating that the brakes on the car were applied on or near the crossing but we need give this no consideration. Beyond this, the testimony of Huntoon was not contradicted in any material respect.

As to the position of the car when the warning calls were given, the plaintiff testified that she called out when the car was about where Depot Street joins South Williams Street and someone called just a second after she did. Witness Berube testified that he was standing on Depot Street about 40 feet from the crossing when the car passed him and he heard some one in the car call out as it passed him.

The train, which was a freight consisting of 36 cars and an engine, approached the crossing from the north. About 100 rods

north of the station the engineer saw the order board was up indicating that the train was to stop at the station or take orders. He applied the service brake and as he came nearer to the station saw a man standing at the south end of the same holding a hoop, which indicated that the train was not to stop but to take orders. He thereupon released the brakes and when at a point just north of the station leaned out of the window of the cab holding his arm out and took the hoop and orders. He did not see the car until after the collision. When the engine was passing the crossing he heard a noise and looked down and saw the car and applied the service brakes with the result that the train stopped with the engine about 320 feet south of the crossing.

In the engine at the time in addition to the engineer were the fireman and a trainman, both of whom were sitting on the side opposite to the engineer. The trainman was sitting in front of the fireman. From their side of the train they had a much better view of Depot Street east of the crossing than did the engineer. From No. 1 switch, which is north of the station and about 330 feet north of the center of the crossing, they testified that they could see the crossing and easterly thereof to the hotel before mentioned. They both saw that the order board was up and at a point about 200 feet north of the crossing the fireman took his attention from the crossing and looked across at the engineer to see if he obtained the orders. At some point a little farther to the north the trainman had likewise turned his eyes from the crossing to the engineer for the same purpose. Neither of them saw the car approaching the crossing while they were watching it nor at any time before the accident as both kept their eyes on the engineer until the engine was very close to the crossing.

The car was struck about at its center and apparently by the breast beam on the engine which extended about 2½ feet beyond the rails on each side. The front half of the car was over the crossing when it was struck.

Various estimates were given as to the speed of the train as it approached the crossing but none exceeded 20 miles per hour. The approach was at a very slight down grade.

The plaintiff alleged three grounds of negligence: excessive speed, failure to give the statutory crossing signals and failure to keep a proper lookout. The court submitted the case on the last two grounds only. The jury returned a verdict for the de-

fendant and the case comes here on exceptions of the plaintiff to the charge of the court.

The first exception has to do with what the court said in its charge in regard to speed, which was in effect that, as a matter of law, the operation of the train at the rate of speed disclosed by the evidence and under the conditions shown did not constitute negligence and that the jury would not consider this matter any further.

The defendant questions the sufficiency of the plaintiff's exception to this instruction but we will assume that it was sufficient and so treat it.

If we assume, without in any way deciding, that there was sufficient evidence to make the claim of negligence in respect to speed a question for the jury, there was no error in taking this issue from them unless there was some reasonable evidence in the case tending to show that such negligence, if any, was the proximate cause of the injuries received by the plaintiff. That the law regards the proximate rather than the remote cause of an injury is axiomatic. *Woodcock's Admr.* v. *Hallock,* 98 Vt. 284, 290, 127 Atl. 380. Much difficulty is sometimes experienced in the application of this rule since no test has been or can be formulated that will solve the question in every case. *Cameron* v. *Bissonette,* 103 Vt. 93, 95, 152 Atl. 87. The determination of what is a proximate and what a remote cause is more a matter of analysis and synthesis than of definition. *Mayor* v. *Foltz,* 133 Md. 52, 104 Atl. 267.

The defendant claims that the speed of the train had no causal connection with the accident and that the sole proximate cause of the same, certainly in so far as this issue is concerned, was the negligent act of Huntoon.

The law on this subject has been recently well stated in the case of *Beatty* v. *Dunn,* 103 Vt. 340, 154 Atl. 770, 771, and we quote from that opinion, omitting the authorities therein cited: ''When negligence is established, liability attaches for all the injurious consequences that flow therefrom until diverted by the intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice. The difficulty in applying this rule often lies in determining what is an 'intervening cause' therein referred to. The answer to this

question is to be found in the character of the intervening act. * * * * If this, itself, is a 'natural and proper result of the original negligence, it will not necessarily prevent recovery thereon.' Otherwise it will. Such an efficient intervening cause, in order to stand as the responsible cause of the ultimate result, must be a new and independent force or agency breaking the chain of causal connection between the original wrong and that result. If that result is merely accelerated by the new cause, the chain is not broken. Thus it is that the negligence of a third person may or may not amount to an efficient intervening cause. If it is something that, in the eye of the law, the person charged was bound to anticipate, the causal connection is not broken; otherwise, the chain of causation is broken."

■ Tested by these rules it is apparent that the negligent act of Huntoon was an efficient intervening cause making his negligence the proximate and the defendant's, if any there was in respect to speed, the remote cause of the accident and injuries. There was nothing about the speed of the train that charged the defendant with anticipating Huntoon's act. The only specific claim of negligence in regard to speed made by the plaintiff below or here relates to the claimed negligent lookout in relation to the rate of speed shown. She points out no other particular circumstance that would make the speed of not over 20 miles per hour a negligent rate. She does not attempt to show, nor could she successfully claim, that negligent lookout had any bearing on Huntoon's actions. As far as the record shows he would have done as he did if the most vigilant lookout were being maintained at the time. She does make some general statement about the location of the crossing but the evidence shows that there was no obstruction to Huntoon's view of the train from the time he saw it until the collision occurred. The plaintiff has pointed out nothing in her brief in respect to the speed of the train which connects the same with Huntoon's negligent act.

■ After Huntoon became aware of the existence of the potential danger created by the assumed negligent speed he by an independent act of negligence brought about the accident. Apparently not excited at the time, he left a place of safety and went into one of danger. Such a voluntary negligent act was not the natural and proper result of the assumed negligence.

The defendant was not bound to anticipate or foresee that as a result of the same Huntoon would act as he did.

The evidence bearing on this issue afforded no room for opposing inferences upon the part of reasonable men. For this reason the court properly took from the jury the question of speed. *Anderson* v. *Sutton,* 100 Vt. 464, 468, 139 Atl. 210.

It may be that the trial court based its ruling upon other grounds, but we may sustain the ruling upon any legal grounds. *Niles* v. *Rexford,* 105 Vt. 492, 168 Atl. 714, and cases cited therein; *Bennett* v. *Robertson,* 107 Vt. 202, 177 Atl. 625, 98 A. L. R. 152.

Error must be made to appear; the judgment below was for the defendant, and it will be affirmed in this Court on any legal grounds shown by the record—whether briefed or not. *Duchaine* v. *Phoenix,* 100 Vt. 112, 135 Atl. 715; *Simpson* v. *Central Vt. Ry. Co.,* 95 Vt. 388, 115 Atl. 299; *Wood* v. *James,* 93 Vt. 36, 106 Atl. 566.

The next and last exception briefed by the plaintiff relates to the court's charge as to the duty of keeping a lookout by the engine crew.

The original charge on this subject was in substance that the duty to keep a lookout for the crossing continued to such point in the yard at a distance from the crossing at which an emergency application of the air brakes of the engine would not have availed to have prevented the accident. No exception was taken by the plaintiff to this portion of the charge.

After the jury had retired they returned twice for additional instructions as to the question of lookout and when the responsibility of the crew ended as to the same as regards the distance of the engine from the crossing. In each of the supplemental charges the jury were told that the duty to keep a lookout ceased at such a point at which the application of the air brakes would not have resulted in the *stopping* of the train before it reached the crossing.

The plaintiff excepted to these supplemental charges on the grounds that the duty to look existed until such time as the application of the brakes would not have reduced the speed of the train sufficiently to delay its arrival at the crossing for such a time as to avoid the accident and that it was the duty of the crew upon discovering the perilous situation of the plaintiff

356

to use all means available to avoid the accident, which might include the sounding of the whistle.

The defendant argues that when in the supplemental charges the court used the word "stop" as applied to train it was so used in the sense of "delay" and that the jury must have so understood it. This argument is without force. If there could have been any question about it, all doubt was resolved by the language of the court in the very last part of the second supplemental charge, which was: "* * * * would not have availed to have prevented that engine·going across the crossing * * * *."

That the supplemental charges of the court were erroneous is so plain that extended discussion on this point is not warranted. It was the duty of the defendant to maintain a reasonable lookout for travelers at the crossing. *Johnson's Admr.* v. *Rutland R. R. Co.*, 93 Vt. 132, 136, 106 Atl. 682. When trainmen see and appreciate the peril of a person on or going onto the track ahead of them it is their duty to do everything possible with the means at hand to avert an accident. *La-Mountain's Admx.* v. *Rutland R. R. Co.*, 93 Vt. 21, 26, 106 Atl. 517; 52 C. J. 252, sec. 1839. When delay by slackening the speed of the train or an additional whistle might have averted the accident it is the duty of the trainmen to use such means. *Johnson's Admr.* v. *Rutland R. R. Co., supra.*

By the supplemental charges the jury were told that the duty to keep a lookout ceased when only one means at hand which might have averted the accident was no longer available to that end, thereby excluding from their consideration all other means which might have availed subsequent to the time when the train could no longer be stopped before reaching the crossing.

It remains to be seen whether this error requires a reversal, viz: whether the plaintiff was prejudiced thereby. For under our present rule he who alleges error has the burden of showing that he has been prejudiced thereby. *Hill* v. *Bedell*, 98 Vt. 82, 126 Atl. 493; Supreme Court rule 9.

That there was ample evidence that the trainmen were not keeping a reasonable lookout for traffic approaching the crossing from the east cannot be questioned. We will assume in favor of the plaintiff that if the jury had been properly instructed they would have found negligence in this respect. But

the defendant would not be liable for the same unless it was the proximate cause or a part of the proximate cause of the injuries received by the plaintiff.

The fireman and the trainman did not look to the east after the train was about 200 feet from the crossing but they are charged with the knowledge of what they would have seen if they had looked. *Rich* v. *Hall*, 107 Vt. 455, 462, 181 Atl. 113; *Durkee* v. *Delaware & H. R. R. Co.*, 106 Vt. 488, 174 Atl. 921.

They would have seen the car approaching the crossing at a rate of speed so slow that several witnesses thought it was going to stop; on a clear afternoon and knowing that from 120 feet east of the crossing the driver of the car had an unobstructed view of the track to the north for at least 270 feet and that at that time the train was in plain sight.

The trainmen would have been required to take action for the plaintiff's safety when they appreciated her peril or it was so obvious that they would be taken to have appreciated it, but not before. *Durkee* v. *Delaware & H. R. R. Co.*, *supra*; *LaMountain's Admx.* v. *Rutland R. R. Co.*, *supra*.

For a time after they should have seen the car, they would have had the right to assume that the driver would stop it or drive off the road and not get upon the crossing. *Durkee* v. *Delaware & H. R. R. Co.*, *supra*, and cases cited therein. The question is, then, when the required time for action came.

Some help is had in answering this question from the testimony of the fireman and the trainman. In reply to a question as to when he would have called to the engineer to apply the brakes, assuming that he had seen the car approaching the crossing from 10 to 12 miles an hour under the conditions existing that day, the fireman said when the car was about 35 feet from the crossing for he would have thought it was going to stop. The trainman in reply to a similar question gave 20 to 30 feet as an answer. But these questions did not take into consideration the element as testified to by Huntoon of speeding up his car after he saw the train. From the testimony and exhibits it is apparent, taking the evidence most favorably for the plaintiff, that the place where he applied the gas was not over 40 feet from the crossing. It is 46 feet from the center of North Williams Street to the crossing.

Certainly up until the time that the car crossed the center of North Williams Street or until Huntoon applied the gas at or about that point the trainmen would have had no reason to anticipate that the car would proceed onto the crossing in front of the approaching train so plainly visible. Up to that time everything concerning the operation of the car pointed to the contrary. Going at that speed the car could have been stopped very suddenly. As has already appeared, several witnesses testified it was going so slowly they thought it was going to stop. We hold that there was no question for the jury as to the duty of the trainmen to act for the safety of the plaintiff before one or the other of the times above mentioned for the same reason as given to the preceding issue.

Assuming that the duty did arise at one of these times we proceed to ascertain whether effective action with the means at hand could have been taken then to prevent the accident. The plaintiff claims there were two such means available, viz: a blowing of the whistle and the application of the emergency brakes so as to retard the train.

The blowing of the whistle, however, would have added nothing to what Huntoon already knew when he applied the gas and had just crossed the intersection. When he saw the train it was upon the main line and the engine was approximately 150 feet south from the No. 1 switch. There was a train approaching at a certain rate of speed. This he saw and watched. A signal from the whistle could have told him no more. After he saw the train he could have stopped the car before it reached the crossing. Such failure to whistle cannot be said to have been a proximate cause of the accident and the injuries suffered by the plaintiff. *Southern Pac. Co.* v. *Kauffman,* (9th Cir.) 50 Fed. (2d) 159; *Stoker* v. *Tri-City Ry. Co.,* 182 Iowa, 1090, 165 N. W. 30, L. R. A. 1918F, 515; *Kulp Transportation Lines* v. *Erie R. R. Co.,* 132 Misc. 821, 230 N. Y. S. 490; *Loiselle* v. *R. I. Co.,* (R. I.) 110 Atl. 407; *Morier* v. *Hines,* 81 N. H. 48, 122 Atl. 330.

We now turn to the question of the application of the emergency brakes as an effectual means of preventing the accident. One Blevins, an expert on air brakes, testified generally on that subject and none of his testimony was contradicted. He testified that tests made showed that the average time between a call to

apply brakes and the application of the same was ¾ of a second when the person applying was in a normal position at the time. That when the person who applied the brakes was leaning out of the window the reaction time would be longer but how much he could not say. He gave the elapsed time for the brakes to be in full emergency application as regards different parts of the train, one such including the reaction element and the others apparently not. At the close of his direct examination he was asked by counsel for the defendant:

> Q. "Now assuming that an automobile was approaching the crossing at 10 to 12 miles an hour and continued on at that rate from a point 30 feet from the crossing and word was given to the engineer to apply the brakes and they were applied in emergency application. Would the train be retarded in any degree before it reached the point of intersection between the train and the automobile?"
>
> A. "A car going 10 or 12 miles per hour is traveling at the rate of 17½ feet per second. It would occupy not more than 2 seconds to be on the track. The train also would be 2 seconds back and if the engineer applied his brake that distance from the crossing, there isn't anything that he could do to delay the arrival of the train at the crossing. * * *"
>
> Q. "Now assuming that same question, that the automobile was 35 feet from the track, what would your answer be as to whether or not the train can be retarded by emergency application of the brake so that a collision could have been avoided?"
>
> A. "The answer would be the same, because it takes 3 seconds from the time the brake valve is moved in order to start retardation of the train. The train brake would have to be started at some point farther than 3 seconds back in order to make any change of speed at the crossing."

It is apparent that the answers to these two questions fixed the retardation time in relation to the time of application of the

brakes and without regard to the reaction time of the engineer after receiving a call to apply regardless of what the questions called for in the way of an answer.

As has appeared, the engineer testified that as he neared the depot he began to lean out of the window and put his arm out. Huntoon saw the train when it was about at the baggage room, which is just north of the depot. But assuming favorably to the plaintiff that the engineer was in his normal position when Huntoon applied the gas, it would have taken at least 3¾ seconds from the time a warning was given to have had any retardation of the train by the application of brakes. Again assuming most favorably to the plaintiff that during that space of time the speed of the car was maintained at 10 miles per hour, it is apparent from the evidence and the exhibits that the car was at least 44 feet back from the easterly edge of the crossing when the time for effectual action from the brakes had passed. In other words, the time for taking effectual action had passed before the time when any duty arose on the part of the trainmen to take action.

In reaching this conclusion we have viewed all of the evidence bearing on this point in the light most favorable to the plaintiff, possibly to an extent beyond which we would be required to go. We have assumed, for instance, in addition to favorable assumptions as to the position of the engineer and as to the continuing speed of the car that one or the other of the engine crew should have appreciated the peril of the plaintiff instantly at one of the two before mentioned points and at that instant called to the engineer. With the evidence so viewed standing against the plaintiff there was no question for the jury on this issue for the same reason as given to the preceding issue.

The issue of negligence in respect to lookout was not properly in the case for as we have seen there was no question for the jury as to it. The charge in this respect was a mere gratuity to the plaintiff who because of it received more than she was entitled to. The error in the charge consequently was not prejudicial. *Pelaggi & Co.* v. *Orient Ins. Co.*, 102 Vt. 384, 397, 148 Atl. 869; *LaMountain's Admx.* v. *Rutland R. R. Co.*, *supra*.

*No error appears. Judgment affirmed.*