Philip DAVIS, Plaintiff-Appellee,

v.

CENTRAL VERMONT RAILWAY, Inc., Defendant-Appellant.

No. 5, Docket 23318.

United States Court of Appeals Second Circuit.

Argued Nov. 14, 1955.

Decided Dec. 16, 1955.

H. H. Powers, St. Albans, Vt., for defendant-appellant.

C. O. Granai, Barre, Vt., A. Pearley Feen and Paul D. Sheehey, Burlington, Vt., for plaintiff-appellee.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

MEDINA, Circuit Judge.

Plaintiff, riding as a guest in a truck, was injured when the front end of the truck was hit by one of defendant's passenger trains at a grade crossing. The appeal is from the judgment entered in plaintiff's favor on the verdict of a jury; and it is claimed: that the trial judge should have directed a verdict for defendant, because of the alleged failure of plaintiff to establish his freedom from contributory negligence, as required by Vermont law; that the requisite diversity was not established by a fair preponderance of the evidence; and that, for a variety of reasons, defendant did not have a fair trial.

We need not linger long over the question of jurisdiction. Plaintiff testified that he moved to Massachusetts and established a domicile there before the commencement of the action. While it appeared that plaintiff did not register his automobile in Massachusetts, that he obtained his car and driver's licenses in Vermont; and as a 4–F did not inform Selective Service headquarters of his change of address, these matters merely went to his credibility and the jury believed him, as is shown by their special verdict on this question. Chicago & Northwestern R. Co. v. Ohle, 117 U.S. 123, 6 S.Ct. 632, 29 L.Ed. 837; Shoaf v. Fitzpatrick, 6 Cir., 104 F.2d 290, certiorari denied 308 U.S. 620, 60 S.Ct. 295, 84 L.Ed. 518; see Gilbert v. David, 235 U.S. 561, 568, 35 S.Ct. 164, 59 L.Ed. 360.

The accident occurred at the Philgas crossing in White River Junction, Vermont, as the truck proceeded up a noticeable grade in a westerly direction, shortly after midnight in the early morning of November 23, 1949. The train was approaching from the north. There was a crossing bell a few feet away, and the railroad employees testified that it was in operation at the time and also that two long and two short blasts were sounded on the engine whistle, at the whistling post a considerable distance north of the crossing. But there was evidence from which it was permissible for the jury to find that neither of these signals was given.

The driver testified that as the paved road on which the truck was proceeding

approached the crossing at an angle, he veered somewhat to his left to get a better view up the track and brought the truck to a full stop eight feet from the nearest rail. The window on the driver's side was partly down and that alongside of plaintiff was closed. There was testimony by the driver and by plaintiff that they listened but heard nothing, that the driver leaned over the steering wheel and looked up the track but saw nothing, and that he asked plaintiff if there was anything coming and plaintiff replied that he had looked but "couldn't see anything either." The driver then started up in low gear and the train hit the front end of the truck on the right side just as it reached the track.

Had the accident happened in the daytime the train would have been plainly visible for a distance of some 650 feet, as the weather was clear and dry. There was also evidence that the locomotive headlight was not on full beam but was "dimmed," and that the passenger train was lit up in the usual way, although the men in the truck might not have seen much if anything of this, as the train was coming directly toward them. The speed of the train was described as between 35 and 40 miles an hour and as "very fast."

■ The applicable Vermont law requires plaintiff to establish his freedom from contributory negligence and in grade crossing accident cases this is interpreted to mean looking and listening, and if necessary stopping to listen. Rashaw v. Central Vermont Ry., 107 Vt. 316, 178 A. 712; Bates v. Rutland R. Co., 105 Vt. 394, 165 A. 923; Goodwin v. Gaston, 103 Vt. 357, 154 A. 772. What defendant's contention on this phase of the case comes down to is, that the train was there and that the testimony of the driver and plaintiff that they looked and saw nothing is incredible as matter of law. Had the accident happened in broad daylight there is much to support this view. See Bates v. Rutland R. Co., supra; Harrington v. Rutland R. Co., 89 Vt. 112, 94 A. 431. But under the circumstances of this case the credibility of these witnesses was for the jury. It is impossible sep-

arately to appraise the various factors. The angle of approach to the track was oblique, it was at night and long before dawn, the absence of the warning signals may have played a minor role, and the dimming of the headlight and the fact that the train was approaching head-on present a state of facts such as to make it clear to us that reasonable men might differ as to whether or not the men looked and saw nothing, as they said they did, and whether on the whole plaintiff exercised that degree of care for his own safety which a reasonable man would exercise under the circumstances.

The cases chiefly relied upon have to do with grade crossing accidents under entirely different circumstances, where an inference was inescapable that plaintiff could not have looked or he would have seen the approaching train. Goodwin v. Gaston, supra; Rashaw v. Central Vermont Ry., supra; Labelle v. Central Vermont Ry., 87 Vt. 87, 88 A. 517; Harrington v. Rutland R. Co., supra. Moreover, it is idle to argue that plaintiff must prove that he looked "effectively," or that plaintiff was charged with knowledge of whatever he could see or hear. He said he looked and listened and did not see or hear the train. We cannot say as matter of law that his testimony is false or that it should be disregarded.

The charge on the subject of contributory negligence was clear and adequate; there was nothing remotely resembling an "emotional appeal" by the trial judge on this or any other phase of the case.

■■ Nor can we find error in the instructions on the subject of the rules of law relative to a determination of whether or not there was negligence on the part of defendant. The underlying general rule is that a railroad company is under a duty to exercise reasonable care to avoid injury to persons or property at a grade crossing, and this duty applies not only to the maintenance of the crossing but also to the operation of the train. Meyette v. Canadian Pac. Ry., 110 Vt. 345, 6 A.2d 33. On this phase of the case there was ample proof to warrant the submission to the jury of the

question of defendant's negligence. We find it necessary to discuss only so much of the charge as relates to the absence of a lookout. Defendant insists that this part of the charge, to which exception was noted, is erroneous, and that a series of requests for further instructions were improperly denied.

It is not disputed that neither the engineer nor the fireman saw the east side of the crossing or the truck before the accident. The view of the engineer was obstructed by the boiler and the fireman was adjusting his water and steam gauges and banking his fire. As we understand it, defendant makes a two-pronged argument: (1) that there was no duty whatever to maintain a lookout as, even if the fireman had seen the truck at a standstill near the track, he would have been justified in assuming that it would stay there; and, further, that if he had seen the truck start up toward the track, it would then have been too late to stop the train in time to avoid the accident; and (2) that, in any event there was no absolute duty to maintain a lookout and the jury should have been instructed that they should take into consideration the other duties of the fireman.

But the purpose of maintaining a lookout was not solely to stop the train when an automobile or other vehicle was observed near or in the process of crossing the track. Nor can we assume that the bell was ringing or that the whistle had been blown, for the jury may well have found that no warning signal was given. Had the fireman seen the truck there was ample time to inform the engineer, who would then have blown the whistle or have blown it again, and this might have been sufficient notice of the approaching train to cause the driver of the truck to remain where he was.

■ Nor did the trial judge charge that the railroad was under an absolute duty to maintain a lookout. The various applicable portions of the charge must be read together. True, he did say that care and prudence in the operation of trains "includes not only the sounding of bells and whistles where needed, but also includes the need for maintaining a lookout for situations of danger, particularly at travelled crossings." But he also unequivocally left it to the jury to say whether, under all the circumstances, the railroad had exercised due care, judged "by the standard of what an ordinary prudent man would have done in like circumstances." This is in accordance with Vermont law. Johnson's Adm'r v. Rutland R. Co., 93 Vt. 132, 106 A. 682; see Meyette v. Canadian Pac. Ry. supra.

■ The difficulty with the submitted requests for instructions is that each of them went too far, as is so often the case. Request No. 10 included the statement that "if the fireman has other duties in the engine cab for the protection or operation of the train, he is excused from looking while the train is approaching a crossing, in order that he may attend to such other duties." Such also is the purport of No. 11, except that the excuse is made applicable only "if you find that the engineer was maintaining a constant lookout," which, of course, was unavailing, as the engineer could not see the easterly side of the crossing. The defect in No. 12 is that it states without qualification that the duty to maintain a lookout "is modified and reduced because of the presence of an automatic warning bell located at the crossing." Finally, No. 13 states that if the warning bell was in good condition and operating there was no duty whatever on the part of the crew of the train "to maintain a proper lookout."

Defendant's claim that it did not have a fair trial is based upon certain parts of the instructions of the trial judge relative to statements alleged to have been made to defendant's former claim agent McVey and its failure to call him as a witness, and also upon a miscellany of minor points.

McVey, in the course of his employment by defendant, interviewed plaintiff, and the driver of the truck, and other witnesses, before the trial. Plaintiff admitted signing a written statement for McVey and it was received in evidence. On the cross-examination of the driver

of the truck he was shown an unsigned statement said to have been procured by McVey, and was asked various questions, based at least in part on the written statement, in order to impeach his credibility. Sholan, the driver, denied making the statements attributed to him, and there were colloquies between the court and counsel for defendant on the subject of whether defendant intended to call McVey as a witness, to which counsel replied in the affirmative. It was obvious that the questions were put to Sholan in order to lay the foundation for proof by McVey of prior inconsistent statements by Sholan. As part of another colloquy plaintiff's counsel expressed interest in serving a subpoena on McVey and making an attempt to locate him. In the meantime, plaintiff offered the unsigned statement in evidence and it was received, for what support it might give to Sholan's denials in view of the other evidence in the case. After all this jockeying, and despite the assurance of defendant's counsel that defendant would produce McVey, he was not produced.

This made it entirely proper for the court, in the part of the instructions bearing on credibility of witnesses, to comment: (1) on the effect of the statement which plaintiff admitted he signed for McVey; (2) on the extent to which Sholan's veracity was impeached by the statements it was claimed he made to McVey but which he denied having made; and (3) the evidentiary value or probative force of the unsigned writing, in which appeared at least some of the statements which Sholan denied having made to McVey, which was received in evidence on Sholan's redirect examination without objection by defendant's counsel.

It was precisely these comments to which vigorous and repeated exceptions were taken on defendant's behalf. The jury were instructed that they might consider plaintiff's written statement to McVey, which he admitted, not only for its bearing on plaintiff's credibility, but also "as evidence of the fact." The tri-

al judge, however, went on to say that there were two other statements "taken from him by McVey" which had not been produced by defendant, and "this has not been denied." The evidence as to these, said the trial judge, might be considered by the jury "in considering how much weight you are going to give the statement that was introduced." We can find no error here.

In connection with his comments on the cross-examination of Sholan, the trial judge very properly instructed the jury that Sholan had denied making the statements to McVey which were attributed to him, and that, as defendant did not produce McVey to prove the making of these alleged prior inconsistent statements "its attempt to impeach the testimony of Mr. Sholan went out the window." This picturesque way of explaining the matter was doubtless understood by all concerned and it was entirely accurate. It is nothing short of absurd to call this a "rebuke to defendant's counsel," or an insinuation that counsel had been "guilty of some wrongdoing" or "misconduct."

With respect to the unsigned writing containing the statements alleged to have been made by Sholan to McVey, which was thus left in midair, the trial judge remarked that the document "is no evidence of the fact of any recitations it contains," and "it was, in fact, offered by the plaintiff during Sholan's redirect examination, to attempt to show the type of thing McVey was up to." It also represented a part of the trial manoeuvres of the respective trial counsel, each of whom was trying to put his adversary on the defensive as to McVey. But we can find no basis for reversal here on the ground that defendant was deprived of a fair trial.

Defendant's other points, at least one of which was not raised at the trial, seem to us to be wholly lacking in merit and not to require discussion.

Affirmed.